# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

STATE OF WASHINGTON

Respondent,

v.

KEVIN WAYNE HOUSER,

Appellant.

No. 57808-5-II

PUBLISHED OPINION

PRICE, J. — Kevin W. Houser appeals his convictions for two counts of first degree child molestation and one count of second degree incest committed against A.H., his six-year-old daughter. Houser challenges his convictions with numerous arguments predominately related to the trial court's determination that A.H. was competent to testify and to the admission of her hearsay statements. He also challenges the trial court's imposition of community custody conditions restricting Houser's alcohol and marijuana use and requiring urinalysis and breath testing.

We hold that the trial court did not abuse its discretion when it determined that A.H. was competent to testify and admitted her child hearsay statements. We also hold that the trial court did not abuse its discretion when it imposed community custody conditions requested by the Department of Corrections (DOC) based on community safety. We reject Houser's other arguments and affirm.

FACTS

I. BACKGROUND

In February 2020, A.H. displayed sexual behavior with her brother that caught the attention of Brian Cooley, her mother's boyfriend. When Cooley asked where A.H. learned about the behavior, she implicated her father and made comments that suggested that he molested her when she visited him. At some point during that same day, Cooley shared the disclosure with A.H.'s mother, Apollonia Boyd. A.H. was taken to the hospital after the disclosure. During the visit to the hospital, a social worker became involved and Child Protective Services (CPS) and law enforcement were alerted.

II. INVESTIGATION

A few days later, Keri Arnold, a forensic interviewer with the county prosecutor's office, conducted a videotaped interview with A.H. about the abuse. A child-interview facility dog was sitting next to A.H.

Like her earlier disclosures to Cooley, A.H. made several statements to Arnold during the interview that suggested her father had molested her. A.H. said that when she was visiting with her dad, she slept in the garage with him. She said she slept on her own bed. A.H. said that during the visits, her father had been touching her "where he's not supposed to" and then indicated where that was by pointing to her genital area. 5 VRP at 155; Ex. 51B. But A.H. appeared reluctant to give details of the alleged abuse and said talking about it felt "not good." 5 VRP at 121; Ex. 51B.

Immediately after the forensic interview with Arnold, A.H. was medically examined by Michelle Breland, a pediatric nurse practitioner. During the examination with the nurse, A.H.

made similar disclosures, specifically that her father was, "touching her where he was not supposed to," and pointed to her genital area. 5 VRP at 95.

Meanwhile, Detective Shelby Wilcox interviewed Boyd, A.H.'s mother, about the alleged abuse that her daughter disclosed to her. Boyd said that A.H. told both Boyd and her boyfriend, Cooley, at their home that A.H.'s father touches her in her private area and that she touches him in his private area. Boyd also said that A.H. pointed to her private area and said her father used a finger to touch her. (Absent from Boyd's interview with the detective were allegations that would come out later about "white stuff" or "sucking." 16 VRP at 561-62, 567-68.)

Several days later, Detective Wilcox interviewed Cooley about A.H.'s behavior and disclosures that she made to him. Cooley said that A.H.'s brother, G.H., told him that A.H. was "trying to pull on his private (no, no)." 5 VRP at 210. He said that when Boyd got home, they sat down with A.H., who confirmed what G.H. had reported to Cooley. According to Cooley, A.H. explained that "[her father] touches her like that, and she also touches him because he says it's okay to do it." 5 VRP at 211. (Like Boyd's interview, certain allegations that came out later were absent from Cooley's interview with the detective, including whether or not Cooley actually witnessed A.H. touch G.H. on the "inner thigh area," and any mention about "yogurt." 5 VRP at 201; 15 VRP at 515.)

As the investigation progressed, law enforcement searched the detached garage where Houser and A.H. slept. In the garage, there was a small mattress where A.H. slept, the cover of which contained a semen stain with DNA that matched Houser.

Following the investigation, the State ultimately charged Houser with three counts of first degree child molestation and one count of second degree incest.

3

Several months after the State charged Houser, A.H. was interviewed again, this time by defense counsel, and her statements were inconsistent with her earlier disclosures. For example, A.H. said that her father "never touched" her. Ex. 52. When defense counsel asked the follow-up questions, "He never did? Did you ever tell anybody that your dad touched your private areas?" A.H. responded, "No." Ex. 52. Defense counsel's interview was audio-recorded.

III. CHILD COMPETENCY AND CHILD HEARSAY EVIDENTIARY HEARING

More than two years after the initial February 2020 disclosures of sexual abuse, the case proceeded to pretrial hearings. The trial court held a pretrial evidentiary hearing to address challenges to A.H.'s competency as a witness and to her child hearsay statements. A.H., Boyd, Cooley, forensic interviewer Arnold, and Nurse Breland all testified.

A.H. began by testifying generally about events in her life, including taking trips to the San Juan Islands. She remembered collecting small yellow rocks on these trips with her grandmother.

A.H. was then asked about incidents with her father. When the State asked her if she remembered something "bad" had happened to her, she said, "Yes." 5 VRP at 165-66. A.H. remembered she and Houser were playing games and then going to bed, but she did not appear to remember any abuse or specifics of what happened because she was sleeping. But A.H. felt the bed shaking.

A.H. was unclear about other details as well. She testified that she slept on the same bed as Houser and Houser's girlfriend, Michelle Molina, in the *basement* (not garage) of Houser's "friend's kind of uncle's house," however A.H. could not remember Molina's name. 5 VRP at 166. (But she recalled that Houser lived in a structure that was "a little bit farther from the real house." 5 VRP at 166). When A.H. was asked how old she was when the abuse occurred, A.H.

4

said she was "either 7" or "about to turn 8" even though she was 6 years old when she made the disclosures. 5 VRP at 167. A.H. also did not appear to remember her forensic interview with Arnold, including that a child-interview facility dog was present.

After A.H. testified, the evidentiary hearing continued with testimony from Boyd. Boyd was first asked about A.H.'s testimony concerning trips to the San Juan Islands—Boyd confirmed that those trips occurred, although the question was vague about the timing. (The State asked, "*At any point in time or in 2020*, were you going on trips to the San Juan Islands?" 5 VRP at 174 (emphasis added). Boyd answered, "Yes." *Id.*)

Boyd was then asked about A.H.'s disclosures of the alleged abuse. In this area, Boyd's testimony differed somewhat from her earlier interview with Detective Wilcox. Whereas earlier Boyd told the detective that A.H. disclosed the abuse to both her and Cooley at their home, Boyd testified at the hearing that A.H. did not actually make any disclosures about the abuse to her. Instead, Boyd claimed she only learned about the details of the abuse at the hospital when Cooley told her what A.H. told him. Boyd's testimony also included other facts that she did not mention to the detective, including that Cooley told her at the hospital that A.H. said,

> White stuff comes out of Daddy's private area, and it tastes salty. I hurt down there sometimes.

5 VRP at 184-85.

Next, Cooley testified about A.H.'s disclosures. Cooley said after returning from work one day in February 2020, he heard G.H., A.H.'s brother, say, "No, [A.H.]. You don't touch me there." 5 VRP at 201. Cooley said he observed A.H.'s hand on G.H.'s "inner thigh area outside of his pants" (even though he did not previously mention anything to the detective during the

investigation about *observing* A.H. touch G.H.). 5 VRP at 201. Cooley then spoke with A.H. and asked her if somebody at her dad's house had touched her; A.H. began "bawling her eyes out" and nodded her head "yes." 5 VRP at 202. Cooley said he then picked up Boyd from work and took A.H. to the hospital.

Both forensic interviewer Arnold and Nurse Breland testified at the evidentiary hearing about the disclosures A.H. made to them during the investigation.

IV. SUBSEQUENT PRETRIAL HEARINGS

After the evidentiary hearing concluded, the trial court held a hearing with the parties focused on whether A.H.'s memory was sufficient for her to be competent as a witness. During the hearing, the trial court expressed some concern about A.H.'s memory:

> [Prosecutor]: With regards to child competency, the burden is on the Defense to rebut the presumption that [A.H.], the child victim in this case, is competent, and the statute clearly says that all witnesses are presumed competent.
>
> [Trial Court]: She doesn't remember anything. She said she was asleep. She doesn't remember being touched. She doesn't remember her clothes being shifted. She doesn't remember any of that.

6 VRP at 224.

But after acknowledging some of A.H.'s memory problems, the trial court discussed how it had been grappling with the question of the level of memory that would be required:

> [Trial Court]: But the point is she remembers going to the garage and sleeping in the bed with Mr. Houser, and then she said she went to sleep, so the question then becomes how much memory is enough memory?
>
> . . . .
>
> If she had gotten up there and said: "No, I don't remember going there. I don't remember any of this. I can't remember any of it," it would be pretty clear she has no memory to recount.

6

> "I remember being there. I remember going to the garage. I remember going to the garage with Mr. Houser, and then I went to sleep."

> [Defense counsel]: And then when I asked her does she have any memory of this incident that she was describing or attempting to describe, she said, no, she has none.

> [Trial Court]: Even though in her forensic statement she gave a different response.

> [Defense Counsel]: Correct.

> [Trial Court]: And so there's also the issue of how much is it reasonable for an 8-year-old girl to remember about something that happened two years earlier when she was 6[.]

> . . . .

> I completely agree that this is a very important question. As a matter of fact, unlike most of the questions that I deal with every day, this one has plagued my mind over the last couple of days.

> . . . .

> We're in that middle ground there, and that's where I have been drifting in the fog.

6 VRP at 229-31.

At a hearing several days later, the trial court continued to ruminate about A.H.'s competency to testify. The trial court discussed the tendency to conflate credibility with competency in a child hearsay setting, but noted,

> Whether or not the jury attaches any credibility or whatever degree of credibility they give to A.H.'s testimony does not affect her competency because of her demonstrated capacity to retain the ability to detail events occurring contemporaneously to the incidence [sic] of abuse.

7 VRP at 269.

7

Ultimately, the trial court decided that A.H. was competent. The trial court concluded its ruling by recounting several of the facts that A.H. remembered around the time frame of the alleged abuse and suggesting that gaps in her memory could be explored during cross-examination:

I would also observe that it's not that A.H. didn't have any memory of any of the circumstances surrounding the complained of incident.

She recalls going to the garage. She recalls sleeping on a bed next to her father. She stated she went to sleep and doesn't remember what happened after that. I mean, I'm paraphrasing her, but that will certainly allow you the opportunity to cross-examine and develop facts, which, as I understand it from the child hearsay hearing, the child competency hearing, would result in her basically acknowledging she has no memory of what happened after she went to sleep. That is cross-examination.

7 VRP at 271.

After addressing child competency, the trial court addressed whether A.H.'s statements would be admissible as child hearsay, including the four disclosures to Boyd, Cooley, forensic interviewer Arnold, and Nurse Breland that were testified about at the evidentiary hearing.

Houser objected to the admissibility of A.H.'s statements made to Boyd and Cooley, apparently on ER 403 grounds. Houser's counsel stated, "I would say that the first two, [Boyd] and [Cooley], are more prejudicial than probative, given their inconsistent natures and the inflammatory natures, especially of both of them." 7 VRP at 273.

The trial court ultimately determined that A.H.'s statements to all four witnesses met the requirements for admissible child hearsay.

V. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial court entered written findings of fact and conclusions of law regarding its child competency and child hearsay determinations.

8

In its written competency findings of fact, the trial court included details from A.H.'s testimony about the trips to the San Juan Islands as part of its conclusion that she had sufficient memory of events contemporaneous with the abuse. The relevant contested findings of fact state:

> 11. A.H. recalled events that happened contemporaneously with the alleged abuse. A.H. remembered something "bad" had happened at her father's, while A.H., defendant, and defendant's girlfriend were on a bed in defendant's garage. A.H. recalled trips to San Juan Island with her "Harmony." She recalled collecting small yellow rocks with Harmony and putting them into a jar. A.H. remembered that during the trips, they would stay at Harmony's friend's house – a man she knew as "Uncle Joe."
>
> 12. Ms. Boyd testified that shortly after February 19, 2020, A.H. stayed with Ms. Boyd's mother, Suk Boyd. A.H. referred to Suk Boyd as "Harmony," because that is the Korean version of grandma. While A.H. stayed with her grandma, they would go on trips to a place that A.H. knew as "San Juan Island." During those trips, they would collect Agate rocks with A.H.'s grandma. They would also stay at her grandmother's boyfriend's house.

CP at 206-07.

The trial court's relevant conclusions of law regarding A.H.'s competency state:

> 4. At the time of the alleged abuse, A.H. had the mental capacity to receive an accurate impression of the abuse.
>
> 5. A.H. has a sufficient memory to retain an independent recollection of the alleged abuse.
>
> . . . .
>
> 9. This court finds A.H. competent to testify as a witness in this case at trial.

CP at 207.

As for child hearsay, the trial court issued a separate written order that outlined the factors applied by the court and determined that A.H.'s February 2020 disclosures to Boyd, Cooley, Arnold, and Nurse Breland would be admissible child hearsay.

9

## VI. TRIAL TESTIMONY

The case proceeded to a jury trial. The State's witnesses included, but were not limited to, A.H., forensic interviewer Arnold, Cooley, Boyd, and Detective Wilcox.[1] Among the defense witnesses were Houser and his girlfriend, Molina.

A.H.'s trial testimony was less detailed than her testimony at the evidentiary hearing. Although she understood that she was there to talk about the "stuff that [her father] did to [her]," she could not remember many of the details that she disclosed at the evidentiary hearing. 15 VRP at 491. She remembered how she traveled back and forth between her mother's and father's house, but she could not remember something happening in a bed with it shaking. And when she was initially asked what her father did to her, A.H. did not give a verbal response, and in cross-examination, she seemed to say that she did not remember her father doing anything to her. But in other portions of her testimony, A.H. said she remembered telling her mother and Cooley about what her "dad had been doing to [her]." 15 VRP at 494. She also said, "Yes," when she was asked if "something happen[ed]," and she stated that when she later found out it was not supposed to happen, she said, "I didn't feel very happy." 15 VRP at 502-03.

Forensic interviewer Arnold testified that A.H. told her at her interview that her father "touched where he wasn't supposed to" when she was sleeping and that he did not want people to know about it. 13 VRP at 429. She also pointed between her legs to indicate where it hurt. A

---

[1] Also testifying for the State was an evidence technician who testified about the search of Houser's garage, a social worker from the hospital who made a report to CPS and law enforcement, Nurse Breland, and a forensic scientist who identified Houser's DNA from one of the semen stains that were found on A.H.'s small mattress.

video recording of the forensic interview with A.H. was admitted into evidence and the State played portions of the video for the jury.

Cooley testified next. Consistent with his testimony at the evidentiary hearing (but unlike his conversation with Detective Wilcox), he testified that he saw A.H. touching her brother on the inner thigh close to his genitals. Cooley asked A.H. if she had ever been touched like that and she nodded her head to indicate "yes." 15 VRP at 513. When Cooley asked her whether someone at her father's house touched her like that, she nodded her head yes.

Cooley also testified as to some additional disclosures from A.H. that were not part of either what he told the detective or what he testified about at the evidentiary hearing. Specifically, Cooley added a new fact that A.H. told him that she tasted her father's "yogurt." 15 VRP at 515. Cooley explained,

> She just said things like, "At nighttime, he becomes a different person. He's not the same person." She tasted his yogurt, things -- honestly, it's hard for me to repeat them because it was very nasty things along the lines of like, you know, at night when she would go to sleep, she would get touched on, and Dad was a different person at night. "He's a monster." She don't like staying nights. "His yogurt doesn't taste good. It doesn't feel good," things along that nature.

15 VRP at 515. Houser did not object.

Boyd also testified. Like Cooley, Boyd added facts to her testimony that had not been previously disclosed.[2] For example, Boyd testified that A.H. told her that "her dad was sucking her." 16 VRP at 561. Houser did not object.

---

[2] Boyd acknowledged that she had memory issues and agreed that her memory was better shortly after the incident than at the time of trial.

When the State asked Boyd to recall her testimony from the evidentiary hearing about A.H.'s disclosures, Boyd repeated her testimony that A.H. talked about "white stuff," saying "that her dad made her taste white stuff and he used a finger." 16 VRP at 562. Boyd further explained that A.H. did not initially disclose to her anything about "white stuff" but that A.H.'s statement was made sometime in the past two and a half years. 16 VRP at 567.

Boyd was also asked about A.H.'s trips to the San Juan Islands, and she agreed that they were happening in the time period of the initial disclosures in February 2020. But later in her testimony, Boyd acknowledged that A.H. continued to take trips to the San Juan Islands well after the 2020 time frame—a fact that was not previously clear during the evidentiary hearing.

The jury also heard testimony that the cover of A.H.'s small mattress contained a semen stain with Houser's DNA.

Soon thereafter, the State rested.

After the State rested, Houser argued that there was insufficient evidence to proceed on multiple counts of child molestation because the evidence, at most, supported one instance of touching. The trial court disagreed and ruled that based on the State's case, including the disclosures from A.H., there was enough evidence for multiple counts of child molestation to go to the jury.

The defense then put on its case. Houser testified and denied molesting A.H. He said he lived in a garage that was next to a house where some of his family lived. Houser denied *sleeping* on the same mattress with A.H. and his girlfriend Molina, but he acknowledged that, at times, all three were on the larger mattress in the garage at night. Houser acknowledged that the small mattress that A.H. slept on was only taken down from the wall and used by her at night. During

cross-examination, the State asked Houser about his sexual preferences. For example, the State asked, "You prefer petite women, correct?" 16 VRP at 691. Houser responded, "Correct." 16 VRP at 691. Houser did not object to the question.

Despite Houser's earlier testimony that A.H.'s small mattress was only taken down from the wall and used by her at night, Houser claimed that he had sex with Molina on A.H.'s small mattress before he got a larger mattress. But after getting a larger mattress, he could not remember if he had sex with Molina on A.H.'s mattress again.[3] Specifically, when asked whether he would remember having sex on his daughter's bed, Houser discussed how he lived an explorative sexual life as part of the "kink community":

> [Prosecutor]: Is that something that you would remember, having sex, whether you had sex on your daughter's bed or not?
>
> [Houser]: At the time, honestly, I couldn't say. I live a very explorative sexual life. I'm a member of [the] kink community, so remembering exactly everything is kind of a lot to remember.
>
> [Prosecutor]: You would agree that having sex on your daughter's bed is something that should be memorable; is that correct?
>
> [Houser]: Yes.

16 VRP at 691. Houser did not object to either of these questions.

Defense counsel's audio-recorded interview of A.H., during which A.H. denied that her father ever touched her, was also played for the jury.

---

[3] Molina also testified and likewise said that she and Houser had sex on A.H.'s small mattress.

VII. CLOSING ARGUMENTS

Following the evidence admitted at trial, the case proceeded to closing arguments. As part of its closing, the State again played portions of the forensic interview video and claimed that A.H. was not coached because of words A.H. *did not* use. The State argued,

> If this was coaching, right, if Apollonia Boyd was the master mind of some conspiracy, how do you think that this disclosure would have looked? [A.H.] would have said that she was being raped.

17 VRP at 755. Houser objected to the State's argument but was overruled.

The State also addressed A.H.'s demeanor on the stand and suggested it showed that she was credible. Notwithstanding the fact that A.H. was unable to testify as to the details of the abuse, the State referenced how A.H.'s demeanor changed when the topic of the questioning switched to the abuse, stating,

> Then look at what happened to that happy, articulate kid the moment that we started asking her about her father and how her demeanor shifted and how she shut down the instant that the subject changed. And I ask you why? Is she an excellent actress trained in the art of flipping like that, or did she change her demeanor like that because her father was touching her and it was very embarrassing just like she told you that it was?

17 VRP at 758-59. Houser did not object.

The State also addressed Houser's DNA on the small mattress and questioned Houser's failure to remember if he recently had sex on it. The State argued,

> Now, the Defendant did try to qualify that a little bit. He said that he could not remember having sex, whether he did have sex or not, on that mattress. I will just leave it up to you whether that's reasonable for someone to not remember taking down your daughter's mattress and having sex on it. I submit to you that it is not reasonable for you not to remember that.

17 VRP at 762. Houser did not object.

In his closing argument, Houser contrasted the forensic interview with his counsel's audio-recorded interview with A.H. about the disclosures. He contended that the forensic interviewer used suggestible questions with A.H. because her questions repeated and reinforced the idea that there was inappropriate touching despite that there were no supporting details. Houser emphasized A.H. completely denied that her father touched her inappropriately in her interview with defense counsel. He also contended that Boyd and Cooley may have "subtly influenced" A.H.'s disclosures. 17 VRP at 782.

And to explain the presence of Houser's DNA on A.H.'s mattress, defense counsel pointed to the testimony that Houser and his girlfriend had sex on her small mattress.

In its rebuttal, the State responded to Houser's suggestion that A.H.'s disclosures were influenced by others by reemphasizing the relevance of A.H.'s change in demeanor during the questioning. The State argued,

> The Defense is saying -- and I don't want to characterize Defense's argument, but it seems like he is suggesting that she is suggestible. It was put in her head, and she just went with it. If she had made this up and this was not true, what is she going to do up here on the stand? I suggest to you that she is going to do one of two things. She is either going to double down and say, "Yep, mm-hmm, he touched me down there," and maybe she has a word for it, right? If it's made up, it's not going to hurt her feelings to talk about it or not as much, or she's going to say that it didn't happen, which is also not what she did.
>
> What did she do? How much silence did she have when I started talking to her about it? Immediately we sat there and you looked at her and she looked at me and we all sat there, and she began to tear up. Is that what you would expect from someone who has made this up, from someone who just adopted this?

17 VRP at 787-88. Houser did not object.

And in response to Houser's suggestion that there was a reasonable explanation for Houser's DNA on A.H.'s small mattress, the State said,

There is no reason for the Defendant and Michelle Molina to be sleeping on that. There is no reason for the Defendant to be having sex with her on that. And if he did on that little mattress, banging his knees against a concrete floor, he would remember it. That's not reasonable.

. . . .

I submit to you that there's no reasonable explanation for [Houser's semen] to be there [on the small mattress].

17 VRP at 787, 790. Again, Houser did not object.

Finally, in response to Houser's argument about the value of defense counsel's interview with A.H. when compared to the value of the forensic interview with Arnold, the State contrasted Arnold's experience as a forensic interviewer and the purpose of a forensic exam with defense counsel's interview with A.H. The State argued,

Ms. Arnold has done 3,200 interviews of children where abuse has been alleged, right? She doesn't get paid every single time there is a disclosure. The purpose of that interview is to make the child feel comfortable and *to get accurate information* and to make sure that they are not coached and that they're not suggested.

Now, contrast that with the Defense interview. The Defense says that the purpose of his interview of the victim was to ask questions about the forensic interview, okay? I submit to you that that's not reasonable, right, and I'm not faulting the Defense for doing their job, okay, but you can't just close your eyes and forget that this is an interview that's directed by someone who is representing a person who is accused of molesting the person that he is interviewing, right?

17 VRP at 791 (emphasis added). Houser did not object.

VIII. VERDICT, SENTENCING, AND APPEAL

The jury found Houser guilty of two counts of first degree child molestation and one count of second degree incest.[4]

---

[4] The jury found Houser not guilty of one count of first degree child molestation.

Before sentencing, DOC performed a risk assessment of Houser. As a result, DOC proposed an "Appendix H," which included recommended community custody conditions to monitor and supervise Houser in the community following his release from prison and to reduce his risk of re-offense. As part of its assessment, DOC concluded that Houser had problems with drug and alcohol dependency and therefore conditions were necessary to address those problems to reduce Houser's risk of reoffending and to "assist in reducing potential risk to community safety." CP at 321. As a result, DOC's proposed Appendix H included a provision prohibiting the use and consumption of alcohol and marijuana and requiring urinalysis and breath testing.

The trial court sentenced Houser to an exceptional sentence of 224 months to life. The trial court ordered a psychosexual evaluation but did not order drug and alcohol or mental health evaluations, suggesting that it did not believe drugs or alcohol were involved in the crimes. The trial court said,

I don't see drug[s] and alcohol as playing a role in this.

1 VRP (Sept. 22, 2022) at 29.

The trial court signed the proposed version of Appendix H to the judgment and sentence, but crossed out the conditions for "Additional Crime-Related Prohibitions" that were related to drugs and alcohol testing (conditions 20-23). The crossed-out condition 20 stated, "Do not purchase, possess or consume alcohol" and condition 23 was a requirement to obtain a drug and alcohol evaluation. CP at 353.

However, other portions of Appendix H still included conditions involving alcohol and marijuana. An earlier section of Appendix H under "Special Conditions – Sex Offenses, RCW 9.94A.703 & .704" contained two conditions that provided as follows:

17

11.  Do not use or consume alcohol and/or Marijuana.

12.  Be available for and submit to urinalysis and/or breath[ ]analysis upon the request of the [Community Corrections Officer] and/or the chemical dependency treatment provider.

CP at 353.  Houser did not object to the imposition of conditions 11 and 12 at the sentencing hearing.

Houser appeals.

ANALYSIS

Houser appeals, making numerous arguments: (1) the trial court abused its discretion by concluding that A.H. was competent, (2) he received ineffective assistance of counsel because his counsel failed to request a mistrial, (3) the trial court abused its discretion by admitting A.H.'s February 2020 child hearsay statements raised at the evidentiary hearing, (4) the trial court abused its discretion by admitting other disclosures not raised at the evidentiary hearing that A.H. made to Boyd and Cooley, (5) the State presented insufficient evidence to sustain his convictions, (6) the State committed prosecutorial misconduct in closing arguments, and (7) the trial court erred by imposing community custody conditions restricting Houser's alcohol and marijuana use and requiring urinalysis and breath testing.

Finally, in his statement of additional grounds (SAG), Houser claims that he received ineffective assistance of counsel because his counsel did not move to dismiss the case for insufficient evidence.

Each argument will be addressed in turn.

I.  CHILD COMPETENCY

Houser argues that the trial court abused its discretion by concluding that A.H. was a competent witness.  We disagree.

A.  LEGAL PRINCIPLES

The bar for competency is low; all witnesses, including children, are presumed competent to testify unless proved otherwise by a preponderance of the evidence.  *State v. Brousseau*, 172 Wn.2d 331, 347, 259 P.3d 209 (2011).  The party challenging the witness's competency bears the burden of proving incompetency.  *Id*. at 343.

The competency of a child witness is evaluated by using specific factors.  In *State v. Allen*, our Supreme Court outlined the factors to be employed by trial courts with child witnesses.  70 Wn.2d 690, 692, 424 P.2d 1021 (1967).  A child's age is not determinative of their capacity as a witness; five factors (the *Allen* factors) must be found for a child to be declared competent to testify:

> "(1) an understanding of the obligation to speak the truth on the witness stand, (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it, (3) a memory sufficient to retain an independent recollection of the occurrence, (4) the capacity to express in words his memory of the occurrence, and (5) the capacity to understand simple questions about it."

*In re Dependency of A.E.P.,* 135 Wn.2d 208, 223, 956 P.2d 297 (1998) (quoting *Allen*, 70 Wn.2d at 692).

We give great deference to trial courts on these child competency decisions.  *Brousseau*, 172 Wn.2d at 340.  " 'There is probably no area of law where it is more necessary to place great reliance on the trial court's judgment than in assessing the competency of a child witness.' " *State*

*v. Woods*, 154 Wn.2d 613, 617, 114 P.3d 1174 (2005) (plurality opinion) (quoting *State v. Borland*, 57 Wn. App. 7, 11, 786 P.2d 810 (1990)), *overruled on other grounds* by *State v. Rohrich*, 132 Wn.2d 472, 939 P.2d 697 (1997).  Deference to the trial court is appropriate because "[t]he competency of a youthful witness is not easily reflected in a written record," and we "must rely on the trial judge who sees the witness, notices the witness's manner, and considers his or her capacity and intelligence."  *Id.*  We may consider the entire record in reviewing the trial court's determination of competency to testify.  *Id.*; s*ee also Brousseau*, 172 Wn.2d at 340.

Accordingly, we review a trial court's competency determination for an abuse of discretion.  *Brousseau*, 172 Wn.2d at 340.  A trial court abuses its discretion if its decision is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons.  *State v. Borboa*, 157 Wn.2d 108, 121, 135 P.3d 469 (2006).

We review a challenge to a trial court's findings of fact to determine if substantial evidence supports them.  *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014).  Substantial evidence is evidence that is sufficient to persuade a fair-minded person of the truth of the premise stated.  *Id.* at 106.  The party challenging the finding of fact bears the burden of demonstrating that the finding is not supported by substantial evidence.  *State v. Smith*, 185 Wn. App. 945, 957, 344 P.3d 1244, *review denied*, 183 Wn.2d 1011 (2015).

B.  APPLICATION

Houser argues that the trial court erred when it determined that A.H. was competent because she did not have the capacity to maintain an accurate and independent memory of the abuse (the second and third *Allen* factors).  Houser also argues that substantial evidence does not

support two of the trial court's factual findings regarding A.H.'s competency. As a result, Houser

contends that the trial court should have excluded A.H.'s hearsay statements.[5]

Houser's appeal of the trial court's competency decision principally relies on his challenge

to portions of the trial court's written findings of fact 11 and 12 in which the trial court outlined

some of the details remembered by A.H. (which the court relied on to find A.H. had sufficient

memory under the *Allen* factors). Finding of fact 11 states:

> A.H. recalled events that happened contemporaneously with the alleged abuse. A.H. remembered something "bad" had happened at her father's, while A.H., defendant, and defendant's girlfriend were on a bed in defendant's garage. A.H. recalled trips to San Juan Island with her "Harmony." She recalled collecting small yellow rocks with Harmony and putting them into a jar. A.H. remembered that during the trips, they would stay at Harmony's friend's house – a man she knew as "Uncle Joe."

CP at 206.

> And finding of fact 12 states:

> Ms. Boyd testified that shortly after February 19, 2020, A.H. stayed with Ms. Boyd's mother, Suk Boyd. A.H. referred to Suk Boyd as "Harmony," because that is the Korean version of grandma. While A.H. stayed with her grandma, they would go on trips to a place that A.H. knew as "San Juan Island." During those trips, they would collect Agate rocks with A.H.'s grandma. They would also stay at her grandmother's boyfriend's house.

CP at 207.

---

[5] The State responds, in part, with a short argument that Houser failed to preserve any error related to A.H.'s competency to testify because he did not separately challenge A.H.'s competency at trial. Houser disagrees, arguing that he actively raised and litigated the issue before the trial court, including at, and after, the evidentiary hearing. Based on the adequate development of the record at the evidentiary hearing and the State's failure to adequately brief the issue of waiver, we exercise our discretion to address the merits of the issue.

In challenging the trial court's decision that A.H. had sufficient memory, Houser mainly points to two aspects of these findings as not being supported by substantial evidence. First, Houser disputes the trial court's finding that A.H. "remembered something 'bad' had happened at her father's." Br. of Appellant at 26 (quoting CP at 206). He asserts that because the word "bad" was merely introduced by the State, this was not an accurate reflection of an actual memory that A.H. had.

Second, Houser points to the trial court's finding that A.H.'s memory of the San Juan Islands trips was representative of A.H. recalling events that happened contemporaneously with the alleged abuse. Houser claims that no witness testified that the trips to the San Juan Islands happened close in time to the instances of alleged abuse and that the testimony actually showed that the trips were ongoing to the present day.

In addition, Houser outlines other things that A.H. could not remember from which he argues she was not competent; he contends that A.H.'s inability to accurately remember certain details at the evidentiary hearing—such as her age at the time of the alleged abuse, the forensic interview, Houser's residence, Molina's name, and the abuse itself—undermines the trial court's finding that A.H. remembered events that happened contemporaneously with the alleged abuse.

Houser's arguments are unconvincing. With respect to his first point about the word "bad," it is true that at the evidentiary hearing the State introduced the word "bad" in its question to A.H. The State asked A.H., "My understanding is that something bad happened with your dad. Is that correct?" 5 VRP at 165-66. But A.H. expressly agreed with the use of the word "bad" by responding, "Yes," to the State's question. 5 VRP at 166. Substantial evidence supports the trial court's finding that A.H. remembered something "bad" happened at her father's residence.

On Houser's second point about A.H.'s trips to the San Juan Islands, the record is less clear. At the evidentiary hearing, the State ambiguously asked Boyd, "*At any point in time or in 2020*, were you going on trips to the San Juan Islands." 5 VRP at 174 (emphasis added). Boyd responded, "Yes." 5 VRP at 174. (The time frame was not clarified.) At trial, Boyd clarified that A.H.'s trips to the San Juan Islands did, in fact, happen shortly after the February 2020 disclosure.[6] Houser fails to show that finding of fact 11 and finding of fact 12 are not supported by substantial evidence.

It is true that at trial Boyd also acknowledged that these trips to the San Juan Islands continued after the 2020 time frame and perhaps even up to the time of trial. But even assuming the on-going nature of the San Juan trips reduces the trips' relevance to the second and third *Allen* factors (re: memories contemporaneous to the abuse), the record before the trial court included other examples of A.H.'s contemporaneous memories. Indeed, the trial court's finding of fact 11 also included the critical sentence that "A.H. recalled events that happened contemporaneously with the alleged abuse," and the entirety of the record supports this finding. CP at 206.

For example, at the evidentiary hearing, A.H. remembered certain details of Houser's home. She recalled that Houser lived in a structure that was "a little bit farther from the real house." 5 VRP at 166. Although A.H. also said that this structure was a "basement" and not a garage, A.H. was correct that the garage was farther from the house because it was detached.

___

[6] Although the trial court made its decision on A.H.'s competency prior to trial, we consider the entire record to review the trial court's child competency determination. *Woods*, 154 Wn.2d at 617; *see also State v. Avila*, 78 Wn. App. 731, 737, 899 P.2d 11 (1995) ("Although a trial court determines competence pretrial, on appeal we will examine the entire record to review that determination."). Moreover, Houser also refers to trial testimony to challenge the trial court's competency determination.

5 VRP at 166. She also remembered that Houser lived, "in like his friend's kind of uncle's house." 5 VRP at 166. Although Houser did not live at the residence of a friend's uncle (the garage was on family property), A.H. was broadly correct that he lived on someone else's property.

Furthermore, while A.H. could not remember Molina's name, A.H. remembered that she, Houser, and Molina shared a bed. Houser's testimony confirmed that he, A.H., and his girlfriend occasionally were together on the larger mattress in the garage at night. Houser acknowledged that the mattress that A.H. slept on was only taken down and used by her at night. And A.H. recalled that the abuse occurred at night.

We acknowledge that A.H.'s memory about events was less than perfect. But assessing the competency of a child witness is difficult, and doing so on appellate record is even more so. *See Woods*, 154 Wn.2d at 617 ("The competency of a youthful witness is not easily reflected in a written record," and we "must rely on the trial judge who sees the witness, notices the witness's manner, and considers his or her capacity and intelligence."); *State v. Kennealy*, 151 Wn. App. 861, 878, 214 P.3d 200 (2009) ("We place particular reliance on the trial court's judgment in assessing a child witness's competency."), *review denied*, 168 Wn.2d 1012 (2010). And here, our record shows that the trial court was thoughtful about this difficult decision, mulling over what was reasonable to expect for a six-year-old's memory, as it balanced the *Allen* factors.[7]

---

[7] As noted above, the trial court said, "And so there's also the issue of how much is it reasonable for an 8-year-old girl to remember about something that happened two years earlier when she was 6. . . . I completely agree that this is a very important question. As a matter of fact, unlike most of the questions that I deal with every day, this one has plagued my mind over the last couple of days. . . . We're in that middle ground there, and that's where I have been drifting in the fog." 6 VRP at 230-31.

Under these circumstances, Houser has failed to meet his burden to show that the trial court's resulting conclusion was an abuse of discretion. Under this standard, we "need not agree with the trial court's decision for us to affirm that decision. We must merely hold the decision to be reasonable." *State v. Lile*, 188 Wn.2d 766, 782, 398 P.3d 1052 (2017). We hold that the trial court did not abuse its discretion in concluding A.H. was competent to testify.

## II.  INEFFECTIVE ASSISTANCE OF COUNSEL

Related to A.H.'s competency, Houser next argues that he received ineffective assistance of counsel when his defense counsel failed to move for a mistrial after trial testimony about A.H.'s San Juan Islands trips was different from the testimony at the evidentiary hearing. We disagree.

## A.  LEGAL PRINCIPLES

To show ineffective assistance of counsel, a defendant must demonstrate that their attorney's performance was deficient and the deficient performance prejudiced them. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (known as the two-prong *Strickland* test); *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013). Failure to establish either prong is fatal to the claim. *Strickland*, 466 U.S. at 700. To prevail on a claim that counsel was ineffective for failing to make a motion, a defendant must establish that the motion would have been granted if made. *State v. Boyer*, 200 Wn. App. 7, 14, 401 P.3d 396 (2017).

## B.  APPLICATION

Houser argues the trial court clearly relied on the testimony in the evidentiary hearing about A.H.'s trips to the San Juan Islands in 2020 to conclude that A.H. had adequate recall about events contemporaneous to the alleged abuse. But when the testimony clarified that these San Juan trips

continued past 2020 and were even taking place at the time of the trial, Houser claims that the trial court's competency rationale was completely eroded—if these trips were on-going, then how does A.H.'s recollection about them support a memory of events occurring contemporaneously with the alleged abuse?

It was at this moment, when it became apparent that these trips were on-going, that Houser appears to claim his trial counsel was deficient for failing to move for a mistrial. Houser claims that the trial court would have likely excluded all of A.H.'s statements had defense counsel immediately challenged A.H.'s competency at that point. And Houser appears to contend that because A.H.'s statements were the only evidence of abuse, had the statements been excluded, the State would have had no case and nothing short of a mistrial would have been appropriate.

Houser's argument fails. Houser cannot show his counsel's performance was deficient under the first prong of the *Strickland* test because, as shown above, the trial court did not abuse its discretion by concluding that A.H. had sufficient contemporaneous memories to be competent even assuming the trips to the San Juan Islands were less relevant than first understood.[8] As a result, Houser cannot show that a motion for a mistrial after Boyd's testimony would have been

---

[8] As noted above, in its explanation of its competency decision the trial court outlined several contemporaneous memories A.H. testified about beyond the trips to the San Juan Islands when it said, "She recalls going to the garage. She recalls sleeping on a bed next to her father. She stated she went to sleep and doesn't remember what happened after that. I mean, I'm paraphrasing her, but that will certainly allow you the opportunity to cross-examine and develop facts, which, as I understand it from the child hearsay hearing, the child competency hearing, would result in her basically acknowledging she has no memory of what happened after she went to sleep. That is cross-examination." 7 VRP at 271.

granted.[9] *State v. Kirwin*, 137 Wn. App. 387, 394, 153 P.3d 883 (2007) ("Counsel's performance is not deficient for failing to file frivolous motions . . . ."), *aff'd*, 165 Wn.2d 818, 203 P.3d 1044 (2009). Therefore, we hold that this ineffective assistance of counsel claim fails.

III. CHILD HEARSAY—FEBRUARY 2020 DISCLOSURES

Houser next argues that the trial court erred in admitting as child hearsay A.H.'s February 2020 disclosures to Boyd, Cooley, forensic interviewer Arnold, and Nurse Breland. We disagree.

The admission of child hearsay about sexual assault is governed by statute. *See* RCW 9A.44.120. The purpose of the child hearsay statute is to ameliorate "the difficult problems of proof that often frustrate prosecutions for child sexual abuse." *State v. Jones*, 112 Wn.2d 488, 493-94, 772 P.2d 496 (1989). Prosecutors must rely on the testimony of the child victim to make their cases because in general, acts of abuse occur in private and often leave no physical evidence. *Id.* at 494. Consequently, the admissibility of statements children make outside the courtroom is critical to the successful prosecution of many child sex offenses.[10] *Id.* Thus, out of court statements by children are allowed to be admitted so long as they meet the requirements of the statute.

---

[9] Because defense counsel's performance was not deficient, we need not address whether Houser was prejudiced by his counsel's failure to move for a mistrial. *See Strickland*, 466 U.S. at 700.

[10] The *Jones* court further explained why children are reluctant witnesses when it said, "Feeling intimidated and confused by courtroom processes, embarrassed at having to describe sexual matters, and uncomfortable in their role as accuser of a defendant who may be a parent, other relative or friend, children often are unable or unwilling to recount the abuses committed on them." *Jones*, 112 Wn.2d at 494.

Among the statute's requirements, the trial court must find "indicia of reliability" of the statements and, *if the child is unavailable to testify*, corroborating evidence of the act. RCW 9A.44.120. The statute reads:

> (1) A statement not otherwise admissible by statute or court rule, is admissible in evidence in . . . criminal proceedings . . . if:
>
> (a)(i) It is made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another . . . .
>
> . . . .
>
> (b) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and
>
> (c) The child either:
>
> (i) Testifies at the proceedings; or
>
> (ii) Is unavailable as a witness, except that when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.
>
> (2) A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party his or her intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings to provide the adverse party with a fair opportunity to prepare to meet the statement.

RCW 9A.44.120.

Here, Houser's argument includes several steps. He argues that (1) A.H. is not competent, and therefore was "unavailable," (2) there is no corroborating evidence to support A.H.'s statements, and therefore, (3) the trial court erred in admitting the statements under the statute. Br. of Appellant at 34.

Even assuming Houser is correct about the absence of corroborative evidence, his entire argument presupposes that A.H. was *not* competent as a witness. But since we have concluded above that the trial court did not abuse its discretion in concluding A.H. was competent, she was not "unavailable" and, therefore, no corroborating evidence was required. Accordingly, we reject Houser's argument that the trial court erred in admitting A.H.'s February 2020 disclosures to Boyd, Cooley, the forensic interviewer, and Nurse Breland.

## IV. OTHER CHILD HEARSAY—BOYD AND COOLEY TESTIMONY AT TRIAL

With some similarities to his initial child hearsay argument, Houser next claims that the trial court erred by admitting additional disclosures that A.H. told Boyd and Cooley. At trial, Boyd and Cooley testified about statements from A.H. not previously mentioned at the evidentiary hearings. Houser argues the trial court erred by not excluding these additional statements. We disagree.

## A. LEGAL PRINCIPLES

As shown above, the statute governing the admission of child hearsay, RCW 9A.44.120, requires the trial court to find "indicia of reliability" of the statements. In *State v. Ryan,* 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984), our Supreme Court established nine factors to determine the reliability of child hearsay statements for the purposes of the child hearsay statute. The *Ryan* factors are:

> (1) whether there is an apparent motive to lie, (2) the general character of the declarant, (3) whether more than one person heard the statement, (4) the spontaneity of the statements, (5) the timing of the declaration and the relationship between the declarant and the witness, (6) whether the statement contained express assertions of past fact, (7) whether the declarant's lack of knowledge could be established through cross-examination, (8) the remoteness of the possibility of the declarant's

recollection being faulty, and (9) whether the surrounding circumstances suggested the declarant misrepresented the defendant's involvement.

*Kennealy*, 151 Wn. App. at 880 (footnote omitted). No single *Ryan* factor is dispositive and the reliability assessment is based on an overall evaluation of the factors. *Id.* at 881.

B. APPLICATION

Houser argues that the trial court erred in admitting Boyd's and Cooley's testimonies at trial that added statements from A.H. that were not previously disclosed—certain additional disclosures regarding "white stuff," "yogurt," and "sucking." Br. of Appellant at 41. First, Houser complains that the State did not provide notice of Boyd's and Cooley's statements as required under the child hearsay statute. Second, Houser argues that Boyd's and Cooley's testimonies about A.H.'s disclosures were unreliable when applying the *Ryan* factors because their testimony at the evidentiary hearing was not consistent with their trial testimony. Finally, Houser argues that these statements were inadmissible under ER 403 because they were substantially more prejudicial than probative and their probative value was minimal. Houser's arguments are unpersuasive.

1. Notice of A.H.'s other disclosures to Boyd and Cooley

Houser's first challenge to these additional disclosures is based on the absence of notice. The child hearsay statute requires advance notice of the statements:

> A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party his or her intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings to provide the adverse party with a fair opportunity to prepare to meet the statement.

RCW 9A.44.120(2).

Houser argues because Boyd and Cooley testified about these additional statements from A.H. for the first time on the stand at trial without any notice from the State, the additional hearsay statements were inadmissible under the child hearsay statute.

At least with respect to Boyd's testimony about "white stuff," Houser exaggerates the absence of notice. Boyd first referenced A.H.'s statements about "white stuff" at the evidentiary hearing more than two weeks before trial.[11]  5 VRP at 184.  Houser fails to show that two weeks is insufficient notice under the statute.  *See State v. Lopez*, 95 Wn. App. 842, 851, 980 P.2d 224 (1999) (the statute does not prescribe a specific notice period).

As for the other statements that came out in trial, Houser failed to object to these statements based on the absence of notice.  Nor did Houser move for a continuance.  *See State v. Swan*, 114 Wn.2d 613, 654, 790 P.2d 610 (1990) ("Since the defense at no time requested a continuance or a chance to reopen its case, it cannot now argue that ample preparation time was lacking."), *cert. denied*, 498 U.S. 1046 (1991).  In fact, Houser made no objection at all to Cooley's testimony at trial that A.H. tasted Houser's "yogurt" or to Boyd's testimony that "her dad was sucking her." 15 VRP at 515; 16 VRP at 561.  With few exceptions, we may decline to review claims of error that the defendant did not raise in the trial court.  RAP 2.5(a).  Therefore, we decline to consider Houser's notice argument with respect to these portions of Cooley's or Boyd's testimony at trial. *Id.*

---

[11] Opening statements began on July 21, 2022, and Boyd first testified about "white stuff" on June 30, 2022.

2. Reliability of Boyd's and Cooley's testimonies

Houser next contends that the new statements from Boyd and Cooley should have been excluded because they were unreliable under the *Ryan* factors. Houser contends that Boyd and Cooley both had a motive to lie about A.H.'s statements (factor 1), the statements were not spontaneous and were made months or years after the disclosure (factor 4), A.H. made the statements months or years after her initial disclosures and could not remember much of the events (factor 8 or 9), and the timing and surrounding circumstances weigh against the reliability of A.H.'s statements (factor 9).

The State responds that Houser misapplies the *Ryan* factors to Boyd and Cooley as witnesses, not to A.H. where the application rightfully belongs.

We agree with the State. Houser predominantly focuses his application of the factors on the reliability of Boyd and Cooley as witnesses, not on A.H. *See, e.g.*, Br. of Appellant at 42 ("Ms. Boyd and Mr. Cooley have an obvious motive to lie."). Indeed, the reliability of Boyd and Cooley is irrelevant to determining the reliability of A.H.'s disclosures. The *Ryan* factors concern the reliability of a child's statements, not the reliability of the witness to whom the child discloses the information. *See, e.g.*, *Kennealy*, 151 Wn. App. at 881-85 (applying *Ryan* factors to the child and not the witness). Any inconsistencies about the witnesses on the stand (Boyd and Cooley) could have been (and were) explored through cross-examination. By largely focusing his application of the *Ryan* factors on the wrong person, Houser's argument is unpersuasive.[12]

_____

[12] We acknowledge that not all of Houser's application of the *Ryan* factors were wrongly placed. Houser also applies some of the factors to A.H., arguing that A.H.'s statements were not spontaneous and the timing and surrounding circumstances of A.H.'s statements weigh against their reliability. Nevertheless, given that no single *Ryan* factor is dispositive, Houser's application

3. ER 403—Risk of prejudice did not substantially outweigh the probative value

Finally, Houser argues that regardless of whether Boyd's and Cooley's trial statements were properly admitted under the child hearsay statute, the trial court still erred by not excluding them under ER 403. He claims that statements of "white stuff," "yogurt" and "sucking" were prejudicial and "did not pertain" to the alleged crimes because Houser was not accused of a crime that required sexual contact like rape, penetration, or contact between mouths or sex organs. Br. of Appellant at 44. Houser is incorrect.

ER 403 provides that even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

It is true that these statements were prejudicial—all evidence is generally prejudicial to the party against whom it is offered—but they were not *unfairly* prejudicial and were far more relevant than Houser contends. Granted, the State did not charge Houser with rape, penetration, or contact between mouths and sex organs. But child molestation and incest still both involve sexual contact. "Sexual contact" is "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010. These statements which were strongly suggestive of sexual contact were, in fact, directly relevant to Houser's molestation and incest charges.

---

of a few of the *Ryan* factors to A.H. is unpersuasive when his main focus is attacking the veracity of Boyd and Cooley.

And the risk of unfair prejudice was minimized because Houser was able to attack the credibility of Boyd and Cooley based on their inconsistent testimony. Even if there was *some* danger of unfair prejudice arising from A.H.'s non-February2020 disclosures, the trial court did not abuse its discretion when it concluded that the danger of unfair prejudice did not *substantially outweigh* the probative value of the information from the disclosures.

Accordingly, we hold that the trial court did not err by admitting the additional disclosures by Boyd and Cooley.

V.  SUFFICIENCY OF THE EVIDENCE

Houser next argues that there was insufficient evidence to support his convictions of two counts of first degree child molestation and one count of second degree incest. Houser's argument, however, assumes the complete exclusion of A.H.'s February 2020 child hearsay statements.

Evidence is sufficient to support a guilty verdict if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find that all of the elements of the crime charged were proven beyond a reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). When a defendant challenges the sufficiency of the evidence, he admits the truth of the State's evidence, and all reasonable inferences drawn from that evidence are to be construed in favor of the State. *Id.* at 265-66.

Houser's challenge to the sufficiency of the evidence hinges on the exclusion of the child hearsay statements. And he makes no attempt to argue that if the child hearsay is not excluded then he would still have any sort of sufficiency of the evidence challenge. But as discussed above, the trial court did not err when it concluded A.H. was competent and admitted her child hearsay statements. Therefore, Houser's argument evaporates.

VI.  PROSECUTORIAL MISCONDUCT

Houser next argues that the State committed prosecutorial misconduct during closing argument and in the questioning of Houser.

A.  LEGAL PRINCIPLES

In a prosecutorial misconduct claim, the defendant bears the burden of showing that the prosecutor's conduct was improper and prejudicial.  *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).  We first evaluate whether the prosecutor's conduct was improper.  *Id.* at 759.  If the prosecutor's conduct was improper, we then determine if the conduct prejudiced the defendant. *Id.* at 760.  Prejudice is established by showing a substantial likelihood that the prosecutor's misconduct affected the verdict.  *Id.*

If the defendant fails to object to the State's remarks at trial, any error regarding prosecutorial misconduct is deemed to have been waived unless the misconduct was "so flagrant and ill intentioned that [a jury] instruction could not have cured the resulting prejudice."  *Id.* at 760-61.

B.  APPLICATION

Houser argues that several actions by the State constitute prosecutorial misconduct.  First, Houser asserts that, considering that A.H.'s testimony included no details about any abuse, the State wrongfully encouraged the jury during closing argument to infer sexual abuse merely from A.H.'s demeanor.  Second, Houser argues that the State committed misconduct by appealing to the jury's passion and prejudice, including asking questions and statements about Houser's "consensual sexual practices."  Br. of Appellant at 55.  Lastly, Houser argues that the State improperly vouched for the forensic examiner.  Each argument fails.

1. The State's arguments based on A.H.'s demeanor were not improper

Houser claims the State committed misconduct when, in the absence of testimony from A.H. about actual abuse, the State wrongfully encouraged the jury to infer sexual abuse merely from A.H.'s demeanor both in its initial closing argument and in its rebuttal. Houser essentially argues the State deliberately led the jury to read too much into A.H.'s silence. Houser's argument is unpersuasive.

Prosecutors have wide latitude to argue reasonable inferences from the evidence in closing argument. *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). Here, the State's statements about A.H.'s demeanor were relevant to the jury's credibility assessment of A.H. With respect to the State's initial remarks about A.H.'s change in demeanor, the State argued a reasonable inference that the change arose from her experience of abuse. *Id.* at 448 (prosecutors have wide latitude to argue reasonable inferences).

Additionally, the State's rebuttal statements were a fair response to Houser's closing. Houser argued in his closing that A.H. was unable to provide details about the abuse because it did not occur. The State responded that A.H.'s silence and tears suggested the authenticity of A.H.'s testimony. This was a proper response to defense counsel's argument. *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994) (the State is entitled "to make a fair response to the arguments of defense counsel," and it is not misconduct to argue that the evidence does not support the defense's theory of the case), *cert. denied*, 514 U.S. 1129 (1995).

2. The State's remarks were not calculated to appeal to the jury's passion and prejudice

Houser next argues that several of the State's remarks were calculated to appeal to the jury's passion and prejudice.

Houser first points to the State's argument that if A.H. had been coached by her mother, she would have used the words that that she was being "raped." Houser asserts the State's remarks suggesting that A.H. was not being coached were somehow improper, but he offers no analysis. Without more from Houser, we are left with the conclusion that the State's argument was a reasonable inference that had A.H. been pressured or instructed to report abuse, she would have described more extreme acts. Houser fails to show any prosecutorial misconduct related to these remarks made by the State.

Houser next argues that the State committed misconduct by unnecessarily making comments or asking questions about Houser's sexual preferences and practices, such as confirming that Houser preferred "petite women," asking about whether having sex on his daughter's mattress was something that he should remember, and supposedly implying that Houser was deviant for having sex with Molina on A.H.'s child-sized mattress.

Houser fails to show that any of the State's remarks in closing about Houser's testimony on these subjects were improper. The semen stains on A.H.'s mattress were critical to the State's theory of its case, just as Houser's explanation for them was critical to his defense. Seen this way, the State's comments were not inflammatory remarks on irrelevant issues. Rather they were a reasonable argument responsive to Houser's explanation that he and his girlfriend had sex on his daughter's small mattress. These comments were not improper.[13]

---

[13] The relevance of the State's question about Houser's preference for "petite women" asked on cross-examination is less clear. 16 VRP at 691. However, this question was asked around the same time as Houser volunteered that he was a "member of [the] kink community" and the State never mentioned this "petite women" preference in its closing argument. 16 VRP at 691. Given that Houser did not object to this question and the State did not mention it again, Houser's argument that this amounts to prosecutorial misconduct fails.

3. The State did not wrongfully vouch for its forensic interviewer

Finally, Houser argues that the State engaged in improper witness vouching of its forensic interviewer, Arnold.[14]  Specifically, Houser contends that the State improperly bolstered the forensic interviewer's testimony when it argued in its rebuttal at closing that the purpose of A.H.'s interview was to get " 'accurate information.' "  Br. of Appellant at 57 (quoting 17 VRP at 791) (The State said, "The purpose of that interview is to make the child feel comfortable and to get accurate information and to make sure that they are not coached and that they're not suggested."). Houser contends that these comments were vouching because Arnold did not actually testify that her job during a forensic interview was about getting "accurate information."

Houser is incorrect.  As a forensic interviewer, Arnold spoke about how she was trained to use interviewing techniques accepted in the scientific community.  She described how interviewers use open-ended questions to gather information from a child without influencing the child's responses.  She also testified about how interviewers determine whether a child is suggestible and how to detect and avoid coaching.  A reasonable and obvious inference could be made that the forensic interviewer's techniques were designed to elicit information.  And it strains common sense to deny that these techniques are intended to obtain information that is as *accurate* as possible.  The State's comments reflected these obvious and sensible conclusions and cannot be considered vouching.  Thus, like the other comments identified by Houser, these comments were not improper.

---

[14] Improper vouching generally can occur in two ways.  First, if the prosecutor expresses his or her personal belief as to the veracity of the witness.  *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010).  And second, if the prosecutor indicates that evidence not presented at trial supports the witness's testimony.  *Id.*

VII. COMMUNITY CUSTODY CONDITIONS

Houser argues that his judgment and sentence wrongfully imposes obligations related to drugs, alcohol, and testing. He asserts that the trial court clearly said that it did not believe drugs or alcohol contributed to the crimes and, therefore, the judgment and sentence's imposition of conditions related to these appears to be scrivener's errors. If not scrivener's errors, Houser argues that the trial court abused its discretion in imposing these conditions because they are not crime related. Houser also argues the breath and urine testing condition invades his right to privacy.

In response, the State briefly argues that Houser did not preserve his challenge to any of the community custody conditions. Substantively, the State denies that the conditions are the result of scrivener's errors and argues that the trial court did not abuse its discretion in imposing the alcohol and drug conditions. The State points out that there are two distinct authorities involved in community custody conditions—the trial court's authority to impose crime-related prohibitions and DOC's separate authority to impose community custody conditions related to community safety. The State suggests that these conditions were the result of DOC's authority and did not need to be crime related.

A. LEGAL PRINCIPLES

A sentencing court may impose crime-related conditions. Under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, "the court may order an offender to . . . [c]omply with any crime-related prohibitions" in its discretion "[a]s part of any term of community custody." RCW 9.94A.703(3)(f); *see also* RCW 9.94A.505(9) (granting the court authority to impose crime-related conditions "[a]s a part of any sentence"). The SRA defines a "crime-related prohibition" as "an order *of a court* prohibiting conduct that directly relates to the circumstances of the crime

for which the offender has been convicted." RCW 9.94A.030(10) (emphasis added); *see also In re Pers. Restraint of Golden*, 172 Wn. App. 426, 432, 290 P.3d 168 (2012) (noting that the definition of " 'crime-related prohibition' " refers specifically to " 'an order of a *court*,' " so it does not apply to DOC (quoting former RCW 9.94A.030(13) (2006))).

DOC also has authority to impose conditions for community custody. "Community custody" is a portion of the offender's sentence that is "served in the community subject to controls placed on the offender's movement and activities by the [DOC]." RCW 9.94A.030(5). And DOC may "establish and modify additional conditions of community custody based upon the risk to community safety." RCW 9.94A.704(2)(a). Because DOC "is not limited to imposing crime-related conditions, its authority to impose community custody conditions is actually broader than the sentencing court's authority." *State v. Ortega*, 21 Wn. App. 2d 488, 495, 506 P.3d 1287 (2022).

The SRA also generally requires the sentencing court to impose these DOC conditions. The sentencing court must require that the offender "comply with *any* conditions imposed by [DOC] under RCW 9.94A.704." RCW 9.94A.703(1)(b) (emphasis added).

We review a trial court's imposition of a community custody condition for an abuse of discretion and will reverse only if the condition is manifestly unreasonable. *State v. Houck*, 9 Wn. App. 2d 636, 643, 446 P.3d 646 (2019), *review denied*, 194 Wn.2d 1024 (2020).

B. APPLICATION

The State asserts with a brief argument that Houser did not preserve his challenge to any of the community custody conditions he now appeals because he did not object to them at the sentencing hearing. Houser fails to respond to this argument.

We may refuse to review claims of error that were not first raised in the trial court. RAP 2.5(a). But our court rule contains an exception for claims of "manifest error affecting a constitutional right." RAP 2.5(a)(3).

Houser's privacy claim conceivably implicates a constitutional right, but community custody provisions are also frequently statutory questions under the SRA. As neither party briefed these issues sufficiently for us to evaluate the proper application of RAP 2.5 with Houser's arguments, we exercise our discretion to reach his arguments. *See Ortega*, 21 Wn. App. 2d at 493-95 (exercising discretion to consider whether the trial court improperly delegated its authority related to community custody provisions, normally a statutory question which an appellate court has discretion to decline to consider for the first time on appeal, when it was interrelated with constitutional vagueness argument).

Turning to the merits, Houser argues that the trial court did not intend to prohibit alcohol and marijuana use or require testing for them because it did not view alcohol and drugs as crime related. According to Houser, the imposition, then, of conditions related to these substances (conditions 11 and 12 in Appendix H) must have been scrivener's errors. Houser also argues that the trial court erred in imposing the urine and breath test condition because it constitutes a significant intrusion of his right to privacy under article I, section 7 of our state constitution. We disagree.

1. Conditions 11 and 12 were proper exercises of DOC's authority

As noted above, the trial court imposed alcohol and drug restrictions in conditions 11 and 12 in Appendix H under "Special Conditions – Sex Offenses, RCW 9.94A.703 & .704":

11. Do not use or consume alcohol and/or Marijuana.

41

> 12. Be available for and submit to urinalysis and/or breath[ ]analysis upon the request of the CCO and/or the chemical dependency treatment provider.

CP at 353. Houser contends that these conditions were scrivener's errors because the trial court said at sentencing that it did not believe that drugs and alcohol were involved in the crimes and the trial court crossed-out conditions 20 through 23 in another portion of Appendix H which reads, in part, "Do not purchase, possess or consume alcohol."[15] CP at 353.

But Houser's argument confuses the trial court's authority to impose crime-related conditions and DOC's separate authority to impose conditions related to community safety. Simply put, conditions 11 and 12 are DOC's requested conditions for community safety.

Before sentencing, DOC performed a risk assessment of Houser. In its risk assessment, DOC noted that Houser has an unaddressed history of alcohol and drug abuse. DOC explained that Houser's alcohol and drug use were risk factors for him if left untreated. As a result, DOC recommended that Houser comply with conditions outlined in Appendix H because it would "assist in reducing potential risk to *community safety*." CP at 321 (emphasis added). This connection between these conditions and DOC's view of community safety is evident because even DOC's risk assessment conceded that neither drugs nor alcohol appeared to have been related to the specific crimes against A.H.

---

[15] A scrivener's error is a clerical mistake that, when amended, would correctly convey the trial court's intention, as expressed in the record at trial. *State v. Davis*, 160 Wn. App. 471, 478, 248 P.3d 121 (2011), *superseded by statute on other grounds as recognized in In re Postsentence Review of Combs*, 176 Wn. App. 112, 119, 308 P.3d 763 (2013), *review denied*, 182 Wn.2d 1015 (2015).

Accordingly, for community safety reasons, DOC's proposed Appendix H included conditions 11 and 12 related to a prohibition on the use and consumption of alcohol and marijuana and a urinalysis and breath testing requirement to monitor and supervise his compliance with these restrictions. The final version of Appendix H, signed by the trial court, included the same conditions.

The structure of Appendix H supports this conclusion. The proposed Appendix H included alcohol and drug conditions in two separate places—the "Special Conditions – Sex Offenses RCW 9.94A.703 & .704" section where conditions 11 and 12 are found, and later under a section entitled "Additional Crime-Related Prohibitions (the condition must be related to the crime being sentenced)." CP at 352-53 (boldface omitted). Considering that DOC and the trial court have separate but somewhat overlapping authorities, it is apparent that the "Special Conditions" section is designed to include DOC's requested conditions for community safety under RCW 9.94A.704. And the "Additional Crime-Related Prohibitions" section is designed to provide the trial court the opportunity to impose separate crime-related conditions under its authority in RCW 9.94A.703.

DOC's initial proposed Appendix H included the recommendation that conditions 11 and 12 be imposed as well as conditions 20-23 in the "Additional Crime-Related Prohibitions" section. At the sentencing hearing, only conditions 20-23 in the "Additional Crime-Related Prohibitions" section were struck. This makes sense—the trial court struck conditions 20-23 because it did not "see drug[s] and alcohol as playing a role in this," 1 VRP (Sept. 22, 2022) at 29, but left DOC's requested community safety conditions 11 and 12. *See* RCW 9.94A.703(1)(b) (sentencing court tasked with requiring offenders to comply with any condition imposed by DOC under RCW 9.94A.704).

43

We presume that the trial court understood Appendix H and do not infer that the trial court rejected DOC's recommendation to impose the alcohol and marijuana restrictions for community safety when it never expressly said so. *See State v. Starr*, 16 Wn. App. 2d 106, 110 n.3, 479 P.3d 1209 (2021) (trial court's imposition of community custody supervision fees was not a scrivener's error where it did not expressly state an intention to waive them).

Thus, when DOC's risk assessment, Appendix H, and the sentencing hearing are viewed in the appropriate context, Houser fails to show that the imposition of the alcohol and marijuana restrictions of conditions 11 and 12 were scrivener's errors. Moreover, Houser fails to show that the trial court abused its discretion when it imposed these DOC conditions. *See* RCW 9.94A.703(1)(b).

2. Houser's privacy claim fails

Finally, Houser argues that the trial court erred in imposing the urine and breath test condition because it constitutes a significant intrusion of his right to privacy under article I, section 7 of our state constitution.

We are unpersuaded. Houser cites no authority establishing that either urinalysis or breath testing, when properly imposed as community custody conditions under DOC's authority, violate article I, section 7. We therefore decline to further consider his claim. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

VIII. SAG

In his SAG, Houser, like his appellate counsel, claims he received ineffective assistance of counsel. However, rather than limit his claim to his trial counsel's failure to move for a mistrial after Boyd's San Juan Islands testimony, Houser claims that his counsel was also deficient for failing to move to entirely dismiss the charges for insufficient evidence. Houser points to certain statements made by the trial court that he claims shows the trial court understood there was insufficient evidence because A.H. had no memory. Houser specifically identifies an exchange after the evidentiary hearing during which the trial court appears to say A.H. remembered nothing:

> [Prosecutor]: With regards to child competency, the burden is on the Defense to rebut the presumption that [A.H.], the child victim in this case, is competent, and the statute clearly says that all witnesses are presumed competent.
>
> [Trial Court]: *She doesn't remember anything*. She said she was asleep. She doesn't remember being touched. She doesn't remember her clothes being shifted. She doesn't remember any of that.

6 VRP at 224 (emphasis added).

From these comments, Houser claims that the trial court *would have* dismissed the charges against him if his defense counsel had only made that motion based on the lack of evidence. We disagree for two reasons.

First, Houser appears to mischaracterize the trial court's perspective by taking the trial court's comments out of context and omitting the remainder of its remarks. In fact, following the comments relied on by Houser, the trial court continued to carefully evaluate A.H.'s memory and concluded her recollection was sufficient for her to be competent:

> [Trial Court]: But the point is she remembers going to the garage and sleeping in the bed with Mr. Houser, and then she said she went to sleep, so the question then becomes how much memory is enough memory?

45

. . . .

If she had gotten up there and said: "No, I don't remember going there. I don't remember any of this. I can't remember any of it," it would be pretty clear she has no memory to recount.

"I remember being there. I remember going to the garage. I remember going to the garage with Mr. Houser, and then I went to sleep."

[Defense counsel]: And then when I asked her does she have any memory of this incident that she was describing or attempting to describe, she said, no, she has none.

[Trial Court]: Even though in her forensic statement she gave a different response.

[Defense Counsel]: Correct.

[Trial Court]: And so there's also the issue of how much is it reasonable for an 8-year-old girl to remember about something that happened two years earlier when she was 6[.]

. . . .

I completely agree that this is a very important question. As a matter of fact, unlike most of the questions that I deal with every day, this one has plagued my mind over the last couple of days.

. . . .

We're in that middle ground there, and that's where I have been drifting in the fog.

6 VRP at 229-31.

When viewed in full context, the trial court's statements do not show, as Houser suggests, an admission that there was insufficient evidence of Houser's guilt. Instead, they merely show that the trial court carefully evaluated A.H.'s competency.

Second, defense counsel actually made a motion similar to the one urged by Houser, but the trial court denied it. After the State rested, defense counsel argued that there was insufficient

46

evidence to proceed on *multiple* counts of child molestation because, at most, the evidence supported one instance of touching. The trial court rejected defense counsel's argument, ruling that there was enough evidence to have multiple counts of child molestation go to the jury. Not only was this motion by defense counsel similar to the one Houser alleges his counsel *should have made*, the trial court's rejection of it utterly guts Houser's claim that the trial court would have granted a motion to dismiss if his counsel had made one.

In the end, Houser uses a highly misleading excerpt from the trial court and criticizes his counsel for not making a motion to dismiss. But his counsel made a similar motion that was rejected. Under these circumstances, Houser cannot establish deficient performance of his counsel on this basis. His SAG ineffective assistance of counsel claim fails.[16]

### CONCLUSION

We affirm.

_____
PRICE, J.

We concur:

_____
CRUSER, A.C.J.

_____
CHE, J.

---

[16] Aside from his ineffective assistance of counsel claim related to his misleading selection of the trial court's comments, Houser also asserts that the State presented insufficient evidence to support his convictions on the nearly identical basis as his appellate counsel related to the exclusion of the child hearsay statements. Given that we have addressed that argument above, we will not further address it here.