# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>    v.<br><br>BRANDON ALEXANDER HEAD,<br><br>               Appellant. | No.  59709-8-II<br><br><br><br>UNPUBLISHED OPINION |

PRICE, J. — Brandon A. Head made plans to engage in sexual acts with a 13-year-old girl named "Taylor."  When Head arrived at the location where he was supposed to meet "Taylor," he learned that he had actually been messaging with an undercover officer as part of a "net nanny" operation.[1]  Head was charged with, and later convicted of, attempted second degree rape of a child and felony communication with a minor for immoral purposes.

Head appeals, arguing that (1) the trial court violated his constitutional right to be present for all critical stages of litigation when it made comments to prospective jurors outside of his presence, (2) the State committed prosecutorial misconduct in several different ways, (3) he was subject to unconstitutional restraint during sentencing, and (4) the trial court erred by imposing a

---

[1] A "net nanny" operation typically refers to a sting operation "designed to catch would-be sexual abusers before they have a chance to sexually assault an actual child." *State v. Stott*, 29 Wn. App. 2d 55, 69, 542 P.3d 1018 (2023), *review denied*, 3 Wn.3d 1002 (2024).  The operation generally involves law enforcement posing online as children or parents of children to offer opportunities for child sexual assault.  *See generally id.* at 59 (describing a Washington State Patrol sergeant posing as a fictitious 13-year-old girl exchanging messages and setting up a meeting with the defendant as part of a net nanny operation).

community custody condition that was unconstitutionally vague and conditions that required Head to pay for supervision fees even though the trial court later found him to be indigent.

We affirm Head's convictions. But we remand Head's judgment and sentence for the trial court to amend the requirement that Head pay for his community custody supervision.

FACTS

I. BACKGROUND

In October 2023, law enforcement conducted a "net nanny" operation in Cowlitz County. As part of this operation, Detective Nicolas Kartes posted an advertisement online, posing as a girl named "Taylor," who was "looking for grown company." Verbatim Rep. of Proc. (VRP) at 170.

Head, believing he was contacting "Taylor," responded to the advertisement and began exchanging e-mails, online messages, and texts with Det. Kartes. In the messages, "Taylor" told Head that she was 13-years-old and that she wanted Head to come over to the house where she was staying. Head told her that he would meet up with her, and the two continued exchanging messages about the sexual acts that they would engage in together.

"Taylor" told Head to first drive to a specific store near "her house" and to bring condoms and a Red Bull energy drink. When Head arrived at the store, he was arrested by law enforcement. Head was in possession of, among other things, condoms, a Red Bull, and erectile disfunction medication. Following Head's arrest, the State charged him with one count of attempted second degree rape of a child and one count of felony communication with a minor for immoral purposes. The case proceeded to a jury trial.

2

II. Voir Dire

Prior to trial, the trial court advised Head that it would provide potential jurors with a questionnaire before jury selection began. The trial court said,

> All right. So, Mr. Head, we're going to do a questionnaire on Monday at nine a.m. You don't need to be present for that; neither does your attorney [n]or the State. I will need that questionnaire by Thursday at four o'clock p.m. And then motions in limine Thursday by four p.m. And Mr. Head, your case will start on Tuesday, April 23rd, at 8:30 a.m. You're ordered to appear at that date and time.

VRP at 30. The trial court provided no further explanation of what it would say to the prospective jurors.

The next Monday, the trial court provided the questionnaire to the juror pool. The parties were not present. Before instructing the potential jurors on completing the questionnaire, the trial court provided a background of the case, including identifying Head and reading the "Information."[2]

> [T]here's a few things that I want to go over with you about that before we get started. This is a criminal case, Cause No. 23-1-00955-08. It's the matter of State of Washington versus Brandon Alexander Head. The State is represented by Mr. Tony Carlow. Mr. Head is represented by Ted DeBray.
>
> In this case we have two counts that we're going to trial on: Count I, Attempted Rape of a Child in the Second Degree. The allegation is that the Defendant, in Cowlitz County, Washington, on or about October 28, 2023, with intent to commit the crime of Rape in the Second Degree, took a substantial step towards the commission of that crime while being at least 36 months older or did attempt to have sexual intercourse with a 13-year old girl. And Count II, Felony Communicating with a Minor for Immoral Purposes. Allegations are the Defendant in Cowlitz County, Washington on or about October 28, 2023, did communicate with a person he believed to be a minor for immoral purposes of a sexual nature

---

[2] An "Information," or charging document, is a "plain, concise and definite written statement of the essential facts constituting the offense charged" that is signed by the prosecuting attorney and filed with the court. CrR 2.1(a)(1), (2).

and such communication occurred through the sending of an electronic communication.

VRP at 32-33. The trial court then went on to read some of the preliminary instructions to the jury, including portions of the standard instructions that explain the duties of the jury, the presumption of innocence, and the definition of reasonable doubt.

> Mr. Head has entered pleas of not guilty to those charges. Those pleas put in issue every element of those charges. The Information in this case is only an accusation against the Defendant, which informs them of the charge. You're not to consider the filing of the Information or the contents as proof of the matters charged.
>
> It will be your duty to determine the facts in this case from the evidence that's presented to you in court. It is also your duty to accept the law from the Court regardless of what you personally believe the law is or what the law ought to be. You're to apply the law to the facts and in this way decide the case.
>
> Mr. Head is presumed innocent, and this presumption will continue throughout the trial—entire trial until you—or unless you find in your deliberations it has been overcome by the evidence beyond a reasonable doubt. The State is the one that has the burden of proving each and every element of those crimes beyond a reasonable doubt.
>
> A reasonable doubt is one for which a reason exists and may arise from the evidence or the lack of evidence and is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or the lack of evidence.
>
> It's important that you discharge your duties without discrimination, meaning that bias regarding race, color, religious beliefs, national origin, sexual orientation, gender, or disability of any party, witness, or attorney should play no part in the exercise of your judgment throughout this trial. We call these conscious biases, and when answering questions it's important, even if it's uncomfortable, for you to share those views with the attorneys.

VRP at 33-34.

The trial court then provided instructions on completing the juror questionnaires and released the pool. The trial court did not caution the potential jurors against discussing the case with others or sharing information about it.

The next day, the trial court advised the parties that the questionnaires had been completed and explained the breadth of what was included in its "initial announcements." VRP at 37.

> I did announce—just so everybody's aware. I know people also do this differently, but when I met with the jury yesterday morning, I did my initial announcements. I went over the charging Information with the jury, that Mr. Head entered pleas of not guilty and that that puts everything in question and the right to be presumed innocent and reasonable doubt and that it's the Prosecutor's responsibility. So, I did that kind of initial summary and then went over the questionnaire with them and asked them to fill them out.
>
> I don't know if there's a request to just go through general questioning with everyone before we look at doing any individual questioning, if there is any motions to excuse for cause on any jurors at this point before we get started, or how Counsel would like to move forward.

VRP at 37-38. Neither party objected nor moved for a mistrial.

III. TESTIMONY OF DET. KARTES

At trial, Det. Kartes, the law enforcement officer who posed as "Taylor," testified about the net nanny operation and the messages he exchanged with Head. He explained that he was part of a specialized unit within the police department called the "Internet Crimes Against Children Unit," which collaborated with federal law enforcement on their "Child Exploitation/Human Trafficking Taskforce." VRP at 167-68. As part of these groups, Det. Kartes explained that he worked on "undercover chatter" assignments that aimed to prevent the sexual exploitation of children. VRP at 169.

Det. Kartes explained that on October 28, 2023, he had made an online posting in which he posed as a girl named "Taylor" seeking a sexual relationship with a "grown man." VRP at 170. He said that Head had responded to his posting. Although this posting did not show "Taylor's" age, Det. Kartes told Head within their first few e-mail messages that he (as Taylor) was 13 years old.

The State then asked Det. Kartes to describe multiple messages from his conversation with Head. Throughout this testimony, the State and Det. Kartes alternated between describing the messages as coming from Det. Kartes and as coming from "Taylor." For example, Det. Kartes and the State had the following exchange regarding Head and "Taylor's" initial plans to meet up:

> [State:] And what did he respond to that?
>
> [Det. Kartes:] "Won't be watching TV. Be doing a lot more than that."
>
> . . . .
>
> [State:] So, you respond to him talking about doing a lot more. And what do you say as Taylor, the 13-year-old girl?
>
> [Det. Kartes:] Yeah, I said, "As in things I've probably seen on TV, ha-ha, or things on my laptop screen, ha-ha. . . ."
>
> [State:] . . . And what did he respond?
>
> [Det. Kartes:] He responded, "The things you see on your laptop screen. Gonna pound you in good."
>
> . . . .
>
> [State:] Okay. And what did you respond as Taylor, the 13-year-old girl, to him telling you he's "gonna pound you in good?"
>
> . . . .
>
> [State:] And what did he—what did Taylor, the 13-year-old girl, respond to that?
>
> . . . .
>
> [State:] Okay. And then we go on where he's asking for more pictures of the 13-year-old girl; is that correct?
>
> [Det. Kartes:] Correct.

[State:] All right. And do you, as Taylor, the 13-year-old girl, send him another picture?

[Det. Kartes:] Yes.

[State:] Okay. And go ahead and read the jury your response?

[Det. Kartes:] I said, "Not the greatest, . . . but I would let you take some without my face if you're here tonight." With that was the image that you see attached . . . .

[State:] Okay. And what did he respond to that?

[Det. Kartes:] He said, "I'll be there."

[State:] And what did Taylor, the 13-year-old girl, respond to the defendant saying "I'll be there"?

. . . .

[State:] . . . After she says she—she can't buy the condom at her age, does he ask anything of her?

[Det. Kartes:] Yeah, he says, "What's the address?"

[State:] Okay. And then what did you respond to as Taylor, the 13-year-old girl?

[Det. Kartes:] I said, "You never answered. Can you bring a condom?"

[State:] And his response was?

[Det. Kartes:] "Yeah."

VRP at 182-85.

The State then continued to ask Det. Kartes to read additional messages from later in his conversation with Head, sometimes posing the question with reference to him "as Taylor, the 13-year-old girl," including when he asked Head for a photo. Head expressed reluctance, perhaps out of concern for being identified.

[State:] Okay. All right. So, then the next conversation series, and we're not going to read through them all, but you, as Taylor, the 13-year-old girl, what do you ask him?

[Det. Kartes:] I ask, "Where are you coming from? If your GPS Longview, what time does it say?"

. . . .

His response was, "45 minutes."

7

[State:] Okay. And you asked the Defendant, as Taylor, the 13-year old girl, to send you a face picture?

[Det. Kartes:] Correct.

[State:] And what's his response?

[Det. Kartes:] "Not best for me to send that."

[State:] Okay. Now, the next response to that, what do you, as Taylor, the 13-year-old girl, say to him?

[Det. Kartes:] I said, "Okay, understand. . . ."

VRP at 185-86. Det. Kartes testified that after this exchange, Head then asked for a photo of "Taylor"; Det. Kartes speculated that Head was trying to make sure that "Taylor" was "really a minor" and "[n]ot a cop." VRP at 188.

[State:] Do you see the text right there? 3:44:18 p.m. you received an incoming text?

[Det. Kartes:] Yes.

[State:] What was that text?

[Det. Kartes:] It said, "Send me a pic of your pussy holding up four fingers next to it. This seems sketchy."

VRP at 188.

As Det. Kartes' conversation with Head went on, Head continued to have concerns that he was being set up by law enforcement. Det. Kartes continued to read the following exchanges of messages between him and Head.

[State:] [W]hat does the Defendant say to Taylor, the 13-year-old girl?

[Det. Kartes:] "I'm worried about me 'cause you're 13."

. . . .

[State:] [G]oing on to the next page. It says—what is the—at the top of the next page at 4:12 and 53 seconds?

[Det. Kartes:] Yeah. So, it's a text message I received. It said, "I'm not trying to come over and get arrested. You seem like you're a cop."

. . . . He said, "I could be wrong, but" I don't know, "IDK. I want to come."

8

[State:] Even though he suspects that it may be a cop, he still wants to come all the way over?

[Det. Kartes:] Correct.

VRP at 189, 191. At no time did Head object to the form of these questions.

IV. CLOSING ARGUMENTS

A. THE STATE'S CLOSING

The State began its closing argument by summarizing the testimony. It reminded the jury of Head's messages with a "13-year-old named Taylor," and that Taylor "was actually an undercover detective with the Internet Crimes Against Children Task Force . . . ." VRP at 250.

The State then read aloud some of the messages between Head and "Taylor" during which they discussed engaging in sexual acts and planning to meet up, repeatedly mentioning "Taylor's" purported age of 13.

> You'll also read in these e-mails and texts that she says—well, the undercover posing as 13-year-old girl named Taylor . . . .

> 42 minutes after the undercover detective, posing as the 13-year-old Taylor—42 minutes after the Defendant was told that Taylor was only 13 years old, he says, after agreeing to drive there, ["]I'm going to pound you good.["]

VRP at 251-52. As the State continued to read the remainder of the conversation, the State occasionally referred to the messages from Det. Kartes as coming from "Taylor," using phrases such as "she responds," "she says," and "she asks him." VRP at 252.

The State also reminded the jury that Head arrived at the store even though he had some suspicions that he was being set up by law enforcement:

> But he wanted to have sex with a 13-year-old girl so bad that he overcame his own suspicion and he drove over an hour away to come meet her. Not only did he drive over an hour away, she set [sic] him on text. Why did she—the detective—set [(sic)] him on text? To prove the case. "Go to [the store], and when you get there,

9

I'll send you the address." Defendant goes to [the store], takes a picture, and sends it to the undercover. . . . He buys a Red Bull. Why did he buy a Red Bull? Because Taylor in the text asked him, "Can you pick me up a Red Bull? Where was that Red Bull found? In the Defendant's car.

VRP at 253-54.

The State went on to outline how the evidence proved Head's guilt for each of the charges. It began by explaining that the jury could find "attempt," because the evidence showed that Head took a substantial step towards the commission of the alleged crime.

The Defendant did everything except actually have sexual intercourse with a 13-year-old girl on October 28th of [20]23. The reason he didn't have sex with a 13-year-old girl that night? Because it was an undercover detective. Otherwise, if that was a real 13-year-old girl, he did everything. He was there. You'll see in the texts he says, "Come out and sit in my car." If that was a real 13-year-old girl, there would have been sexual intercourse that night. Thankfully, it wasn't a 13-year-old girl. It was an undercover detective.

How else do we know it's a substantial step and not mere preparation? Well, we know he drove over an hour to get there. We know he followed all her directions. Switch over to my texts, [inaudible] they were readable [sic]. Tell me when you're at [the store]. Did you bring condoms? Do you need lube? All those things he took care of. The bonus that she didn't know about was the BlueChew erectile dysfunction drug, but I guess he may need that if he has five condoms. He even parked exactly where she told him. Was he ready to have sex that night? He was there. It was going to happen. Fortunately, it wasn't an actual 13-year-old girl.

VRP at 257-58 (2nd & 3rd alteration in original).

Given that Head's charges were part of a net nanny operation, the State explained that there did not need to be an actual victim to convict Head of *attempted* second degree rape of a child.

If the conduct in which a person engages otherwise constitutes an attempt to commit a crime—and I submit to you . . . it is no defense to a prosecution of such attempt that the crime charged [to have been] attempted was[,] under the intended circumstances[,] factually or legally impossible of commission. What does that mean? That means he could not have had sex with that particular 13-year-old Taylor that night because that particular 13-year-old Taylor was Det. Kartes. He didn't know that. What we're trying to do is criminalize 26-year-old men having

sex with a 13-year-old girl and hold people accountable for that. We're trying to ferret that out before it happens.

VRP at 260-61.

The State then went on to explain how it had proved the elements of the crime of communication with a minor for immoral purposes. Based on the evidence, the State gave the opinion that it thought Head's conduct had been "immoral." VRP at 261. The State said,

> The Defendant communicated with a person for immoral purposes of a sexual nature. That is not defined for you, but I trust that we all know what moral versus immoral is, and I think we also know what a sexual nature is.
>
> When he says by way of text or e-mail, "Show me a picture of your pussy with four fingers," and I apologize for that language—those aren't my words; those are the Defendant's words—I think we could all agree that not only is that immoral purposes, but it's also a sexual nature. I think when the Defendant sends texts and e-mails that says, "I'm going to give you a good pounding" multiple times when he knows she's 13, I think that's immoral purposes of a sexual nature, and I hope you agree with me, because that's exactly what that is.

VRP at 261-62. At the end of its closing, the State reminded the jury that its role was to apply the law to the facts of this case to determine Head's guilt.

> I wanted to go through the law with you because the law is important, and you heard all the facts—or excuse me, you heard all the testimony, you've seen all the evidence. There's no more evidence to give you. You have it all. As jurors, you get to decide what the facts are. That's—that's your job.

VRP at 262.

There were no objections during the State's closing.

B. THE DEFENSE'S CLOSING

During their closing argument, defense counsel conceded that there was sufficient evidence to convict Head of communicating with a minor for immoral purposes, so they focused on the attempted second degree rape of a child charge.

11

The defense emphasized that to find proof of "attempt," the jury would have to find evidence that Head took a "substantial step" toward the commission of second degree rape of a child, or "conduct that strongly indicates a criminal purpose, and . . . is *more than mere preparation*." VRP at 264-65 (emphasis added). The defense then contended that although there was substantial evidence that Head prepared to meet up with who he thought was a 13-year-old girl, there was not enough evidence to show more than that.

C.  THE STATE'S REBUTTAL

During rebuttal, the State relisted the evidence that it contended showed that Head's conduct was more than "mere preparation."

> It was more than mere preparation.  What is missing?  What is missing from him responding to the ad, knowing she's 13 years old, being suspicious of her being 13 years old, thinking she may be a cop, thinking this is an operation, and still not being able to overcome his own desires to have sex with a 13-year-old, driving all the way . . . over an hour away, stopping where she tells him to stop, sending a picture of him, going in an getting a Red Bull she asked for, bringing five condoms and [erectile disfunction medication] and lube with him. . . . He stops and parks exactly where he's told to park.

VRP at 266.  The State then provided its opinion that if law enforcement had not stopped Head (and Taylor had been real) that he "would have" committed second degree rape of a child.  VRP at 266.

> The only thing missing, members of the jury, is the actual penetration.  The only reason there was no penetration is because the cops stop[ped] him.  Otherwise, this wouldn't be an Attempted Rape of a Child if that was an actual 13-year-old girl. Thankfully it wasn't.  And if the cops didn't stop him, it would have been Rape of a Child in the Second Degree.

VRP at 266.

12

The State then went on to reiterate that the evidence was sufficient to prove attempted second degree rape of a child and that catching individuals like Head was the goal of the joint taskforce. The State said,

> Members of the jury, I'm asking you to look through the evidence. That is the Defendant. Basically, he conceded that. . . . The Defendant planned to have sex with a 13-year-old girl. We have that Child Exploitation and Human Trafficking Taskforce to stop that the best we can. That's why that operation, the Internet Crimes against Children Taskforce joined with the FBI taskforce to stop people who are out there trying to have sex with 13-year-olds.

VRP at 266-67.

The State concluded by thanking the jury for their role in ensuring, according to the State's "opinion," the fairness of the trial.

> The Defendant is afforded many constitutional rights throughout the course of this case. . . . Number one is the Defendant's right to a fair trial. The State also has a right to a fair trial. But I want to commend you and everybody involved in this process because both sides, *in my opinion*, did get a fair trial, and we're thankful for that. And we talked about how the system would shut down if people didn't show up. You heard some of the things that people said in jury duty. You people are willing to do—do your civic duty, and I appreciate that. And that affords the State and the Defendant a fair trial.

VRP at 267-68 (emphasis added). Once again, the State concluded its rebuttal by reminding the jury that it was their job "to decide what the facts are," "apply them to the law," and "remove the presumption of innocence" by finding Head guilty of the charges. VRP at 268.

V. SENTENCING

On June 11, 2024, Head appeared for sentencing in a holding cell that was located inside the Cowlitz County courtroom. Neither Head nor defense counsel objected to Head's appearance in the holding cell. The trial court imposed a low-end indeterminate sentence of 76.5 months and lifetime community custody.

Community custody conditions were imposed by Appendix H, which was attached to the judgment and sentence. Condition (a)(8) stated, "Remain within geographic boundary, as set forth in writing by the Community Corrections Officer." Clerk's Papers (CP) at 48. Condition (b)(9) stated, "Submit to polygraphs at [your] own expense for the purpose of monitoring conditions, as directed by your CCO." CP at 48. Condition (b)(16) stated, "You must not access the internet without internet monitoring software. The software must be approved by your assigned CCO. The monitoring software will be paid for at your own expense." CP at 49.

Head appeals.

ANALYSIS

Head makes multiple assignments of error. First, he argues that the trial court violated his constitutional right to be present for all critical stages of litigation when it made substantive comments about his case to prospective jurors outside of his presence. Second, he argues that the State committed prosecutorial misconduct (a) by appealing to the jury's passions and prejudice, (b) by eliciting testimony that appealed to the broader issues of the sexual assault and exploitation of children, and (c) by asserting its own personal opinions regarding Head's guilt. Third, he argues that he was subject to unconstitutional restraint during sentencing. Fourth, he argues that his community custody condition requiring him to remain in a geographic area was unconstitutionally vague, and that the trial court erred by requiring Head, even though he was indigent, to pay for certain services as part of his community custody conditions.

I. RIGHT TO BE PRESENT

For the first time on appeal, Head argues that the trial court erred when it made its "initial announcements" to potential jurors outside of his or his attorney's presence. He contends that this

violated his right to be present at all critical stages of his prosecution. We hold that Head waived this issue when he failed to object as soon as he learned of the alleged violation.

A criminal defendant's right to be present is protected by the confrontation clause of the Sixth Amendment of the federal constitution, the due process clauses of our federal and state constitutions, and article I § 22 of our state constitution. U.S. CONST. amds. VI, V; Wash. Const. art. I, §§ 3, 22. A defendant has a right to be present when evidence is being presented, and " 'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.' " *State v. Slert*, 186 Wn.2d 869, 875, 383 P.3d 466 (2016) (quoting *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 306, 868 P.2d 835 (1994)).

Voir dire is a critical stage of trial during which a defendant has the right to be present. *State v. Irby*, 170 Wn.2d 874, 883-84, 246 P.3d 796 (2011). And "[a]s a general rule, the trial court should not communicate with the jury in the absence of the defendant." *State v. Bourgeois*, 133 Wn.2d 389, 407, 945 P.2d 1120 (1997). "If the right is violated, we will reverse unless we are persuaded beyond a reasonable doubt that the error was harmless." *Slert*, 186 Wn.2d at 874-75.

But the alleged violation of certain rights, including the right to be present, must be objected to at the trial court in order to avoid waiving review. *Id.* at 875. In *Slert*, the trial court had held an in-chambers discussion with counsel regarding jurors' written answers to a special questionnaire, which explored their prior knowledge of a high profile case. *Id.* at 873. The defendant was not present. Following this discussion, the trial court returned to the court room and, with the defendant now present, dismissed four jurors "based on the answers to the questionnaire." *Id.* (internal quotation marks omitted). Although the defendant was present and

witnessed the jurors' dismissal, he did not object. In a 5-4 decision, the *Slert* court held that the defendant "waived review" of any constitutional claim. *Id.* at 875, 876 n.3 (emphasis omitted). Although the defendant had the right to be present for the in-chambers discussion, he had waived appellate review by failing to object once he became aware of the consequences of the in-chambers discussion, namely the jurors' dismissal. *Id.* at 875. The *Slert* court reasoned that the defendant had a reasonable opportunity to object at this time, and by failing to do so they deprived the trial court of the opportunity to remedy its error.[3] *Id.* at 873, 876.

Later, in *State v. Burns*, our Supreme Court clarified that *Slert* represents a category of constitutional errors that, unless objected to below, are not reviewable (even without doing a RAP 2.5(a)(3) "manifest constitutional error" analysis). 193 Wn.2d 190, 208, 210-11, 438 P.3d 1183 (2019). Rejecting the need to apply RAP 2.5(a)(3) in all cases of constitutional violations, the *Burns* court explained that some constitutional rights, such as the right to be present and confrontation rights, are unreviewable if the defendant fails to object at trial.[4] *See id.* at 210-11. In these cases, the requirement of an objection "is in the interests of judicial efficiency and clarity,

---

[3] The dissent appeared to question *Slert*'s simplification of error preservation for the right to be present, contending that the majority's analysis "confuses and conflates two independent and separate principles: constitutional waiver and failure to preserve error." *Slert*, 186 Wn.2d at 880 (Johnson, J., dissenting). The dissent explained that because the defendant's claim on appeal concerned waiver of an alleged constitutional violation, the proper analysis was not whether the defendant timely objected or "preserved" the error, but whether the defendant's waiver of the rights was knowing, voluntary, and intelligent. *Id.* at 881-82.

[4] The *Burns* holding that certain categories of constitutional errors must be objected to or else they are unreviewable did not appear to be unanimous. A concurring opinion commented that this aspect of the majority's holding runs counter to the procedures articulated in RAP 2.5 and could lead to "confusing," "varied," and "unpredictable" results. *Burns*, 193 Wn.2d at 212, 219 (Stephens, J., concurring).

and provides a basis for appellate courts to review a trial judge's decision." *Id.* Although *Burns*

involved the right to confrontation, not the right to be present, the *Burns* court endorsed the holding

in *Slert*, stating,

> Thus, we . . . explicitly adopt a requirement that a defendant raise an objection at trial or waive the right of confrontation. Requiring an objection brings this claim to align with what we employ in other cases where we have held that some constitutional rights may be waived by a failure to object. *See, e.g.*, *State v. Slert*, 186 Wn.2d 869, 383 P.3d 466 (2016) (Sixth Amendment right to be present during in[-]chambers discussion of potential jury bias waived when defendant did not object at trial); . . . . Where a defendant does not object at trial, "nothing the trial court does or fails to do is a denial of the right, and if there is no denial of a right, there is no error by the trial court, manifest or otherwise, that an appellate court can review."

*Id.* (footnote omitted) (some citations omitted) (quoting *State v. Fraser*, 170 Wn. App. 13, 25-36,

282 P.3d 152 (2012)).

Here, Head argues that the trial court violated his right to be present when it provided

potential jurors with substantive information and instruction without the parties being present.

Head argues that the trial court went well beyond giving the jury pool the questionnaire; the trial

court told the potential jurors his name, read the Information containing the charges and the details

of the allegations, and actually provided certain jury instructions, including the duty to " 'apply

the law to the facts,' " the presumption of innocence, and the reasonable doubt standard. Opening

Br. at 45 (quoting VRP at 33). According to Head, his right to be present was violated because

these communications "bore a 'reasonable substantial' relationship to the 'fullness of his

opportunity to defend against the charge[s].' " Opening Br. at 51 (quoting *Irby*, 170 Wn.2d at

881).

Although Head did not object as soon as he learned of the trial court's action, he contends that his claim was not waived because, in essence, the damage was already done.

We hold Head's claim was waived. *Slert* and *Burns* instruct that this type of error is in the category of constitutional errors that must be preserved below.[5] *See Slert*, 170 Wn.2d at 875, 876 n.3; *Burns*, 193 Wn.2d at 211. Although the trial court failed to notify Head or counsel that it was going to make substantive comments to the jury before they occurred, the trial court promptly notified Head of what it had done on the first morning of trial.[6] At that moment, Head had a reasonable opportunity to object or move for a mistrial, but he stayed silent. As explained in *Slert*, if Head had objected as soon as he learned of the trial court's actions, the trial court could have addressed the alleged error by potentially calling a new juror pool, untainted by the trial court's ex parte contact. *Slert*, 170 Wn.2d at 873. Bringing in an untainted pool, before jury selection had even started could have cured the error before the parties, the witnesses, and the trial court all undertook an entire trial. *Slert* requires Head to have afforded that opportunity to the trial court,

---

[5] The clarity of this instruction is especially evident when the criticisms of the *Slert* dissent and the *Burns* concurrence are used as interpretive tools for those decisions.

[6] The trial court explained:

> I went over the charging Information with the jury, that Mr. Head entered pleas of not guilty and that that puts everything in question and the right to be presumed innocent and reasonable doubt and that it's the Prosecutor's responsibility. So, I did that kind of initial summary and then went over the questionnaire with them and asked them to fill them out. I don't know if there's a request to just go through general questioning with everyone before we look at doing any individual questioning, if there is any motions to excuse for cause on any jurors at this point before we get started, or how Counsel would like to move forward.

VRP at 37-38.

rather than to have sat silently and awaited his appeal. *Id.* Accordingly, we do not address Head's argument.[7]

II. PROSECUTORIAL MISCONDUCT

Head next argues, also for the first time on appeal, that the State committed three instances of prosecutorial misconduct and that the cumulative effects of this misconduct could not have been cured by an instruction. We disagree.

To prevail on a claim of prosecutorial misconduct, a defendant must first demonstrate that the prosecutor's statements were improper and, second, that they were prejudicial. *State v. Houser*, 30 Wn. App. 2d 235, 271, 544 P.3d 564, *review denied*, 3 Wn.3d 1015 (2024). Prejudice occurs when " 'within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.' " *State v. Weber*, 159 Wn.2d 252, 270, 149 P.3d 646 (2006) (internal quotation marks omitted) (quoting *Bourgeois*, 133 Wn.2d at 403).

If the defendant objects at trial, " 'the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.' " *State v. Azevedo*, 31 Wn. App. 2d 70, 78, 547 P.3d 287 (2024) (quoting *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012)). But if a defendant fails to object, waiver is presumed unless the defendant can show that the statements were so flagrant and ill-intentioned that no instruction

---

[7] Although we do not address the merits of Head's claim, the trial court's actions here were, at a minimum, ill-advised. *See State v. Yonker*, 133 Wn. App. 627, 634, 137 P.3d 888 (2006) (explaining that in general, "a trial court should not communicate with the jury in the defendant's absence"); *State v. Caliguri*, 99 Wn.2d 501, 508, 664 P.2d 466 (1983) ("It is settled in this state that there should be no communication between the court and the jury in the absence of the defendant.").

could have cured them. *Id.* at 78-79. Our analysis focuses more on whether the prejudice could have been cured and less on whether the prosecutor's misconduct was flagrant and ill-intentioned. *Id.* at 79.

When a prosecutor's alleged misconduct occurs in closing argument, we examine the conduct in " 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.' " *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)).

A prosecutor has wide latitude to make reasonable inferences from the evidence presented at trial during closing argument. *State v. Rodriguez-Perez*, 1 Wn. App. 2d 448, 458, 406 P.3d 658 (2017), *review denied*, 190 Wn.2d 1013 (2018). Reasonable inferences can include commentary on a witness's demeanor at trial, manner of testimony, or credibility, so long as they are based on the evidence. *Id.* at 458, 460.

However, a prosecutor is not given free rein to say whatever they wish to a jury. Arguments still must be rooted in " 'probative evidence and sound reason.' " *In re Pers. Restraint of Glassmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)). They cannot make arguments that solely appeal to the passions and prejudice of the jury. *State v. Bellerouche*, 33 Wn. App. 2d 877, 907, 565 P.3d 604 (2025). Nor can they express a personal opinion about the defendant's guilt. *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014). But to be considered misconduct, a prosecutor's personal opinion must be " 'clear and unmistakable.' " *McKenzie*, 157 Wn.2d at 54, (emphasis omitted) (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)).

A. PASSIONS AND PREJUDICE OF THE JURY

Head argues that "[t]he State improperly inflamed the passions of the jury by repeatedly personifying a fictional 13-year-old girl" while questioning Det. Kartes and during closing argument. Opening Br. at 29. According to Head, these repeated comments influenced the jury to convict Head based on their misplaced sympathies for a fictitious victim. We disagree.

Head contends that the State first laid the foundation for creating an "image of 'Taylor, the 13-year-old girl' " by repeatedly going out of its way to mention "her" name and age throughout trial and closing argument. Reply Br. at 5. Head points to 10 instances throughout the State's direct examination of Det. Kartes[8] and four instances during closing argument where the

---

[8]

    1. "So, you responded to him talking about doing a lot more. And what do you say as Taylor, the 13-year-old girl?"
    2. "Okay. And what did you respond as Taylor, the 13-year-old girl, to him telling you he's [going to engage in intercourse]?"
    3. "And what did he—what did Taylor, the 13-year-old girl respond to that?"
    4. "And do you, as Taylor, the 13-year-old girl, send him another picture?"
    5. "And what did Taylor, the 13-year-old girl, respond to [Mr. Head] saying 'I'll be there'?"
    6. "[H]e says, 'What's the address?' Q: Okay. And then what did you respond to as Taylor, the 13-year-old girl?"
    7. "Okay. All right. So, then the next conversation series, and we're not going to read through them all, but you, as Taylor, the 13-year-old girl, what do you ask him?"
    8. "Okay. And you asked [Mr. Head], as Taylor, the 13-year-old girl, to send you a face picture?
    9. "Okay. Now, the next response to that, what do you, as Taylor, the 13-year-old girl, say to him?"
    10. ["]And what does [Mr. Head] say to Taylor, the 13-year-old girl?"

Appellant's Opening Br. at 30-31 (alterations in original) (internal citations omitted) (quoting VRP at 182-86, 189).

prosecutor either referred to statements made by Det. Kartes as made by "Taylor, the thirteen-year-old girl," "Taylor," or "she."

Then, Head contends that after creating this image of a fictional 13-year-old girl for jurors to emotionally attach to, the State "used that image . . . to suggest that the *only* reason rape of a child was not committed was law enforcement arresting [him]" during rebuttal. Opening Br. at 32. Specifically, he points to the following portion of the State's rebuttal argument:

> "The only reason there was no penetration is because the cops stop him. Otherwise, this wouldn't be an Attempted Rape of a Child if that was an actual 13-year-old girl. Thankfully, it wasn't. And if the cops didn't stop him, it would have been Rape of a Child in the Second Degree."

Opening Br. at 32-33 (quoting VRP at 266).

Head argues that the combination of these tactics went beyond the State's permissible allowance to argue "fair inferences from the evidence." Opening Br. at 33. Instead, Head contends "[t]he State reached for the emotional appeal of a victim it did not have" and that "bore no relevance to what the State had to prove at trial." Opening Br. at 33-34.

First addressing Head's arguments regarding the State's repeated references to "Taylor, the 13-year-old girl" in the examination of the detective, we disagree that the State's comments were improper. Viewing the State's direct examination of Det. Kartes as a whole, the State was attempting to convey the story of the text discussion the detective was having with Head. Telling this story required the State to convey what Det. Kartes was testifying to as himself, and what was being said to Head in the texts as "Taylor." The language used by both the State and the witness during this questioning is a reflection of these dynamics and challenges, rather than an impermissible attempt to create the impression for the jury that "Taylor" really existed or that the

jury should unfairly sympathize with a nonexistent victim. In fact, throughout the detective's testimony, the State clarified that it is Det. Kartes who is responding to Head's messages and that he is just *posing* as "Taylor." For example,

> [State:] So *you respond* to him talking about doing a lot more. And what do *you say* as Taylor, the 13-year-old girl?
>
> [Det. Kartes:] Yeah, *I said*, "As in things I've probably seen on TV, ha-ha, or things on my laptop screen, ha-ha. . . ."
>
> [State:] . . . And what did he respond?
>
> [Det. Kartes:] He responded, "The things you see on your laptop screen. Gonna pound you in good."
>
> . . . .
>
> [State:] Okay. And what did *you respond* as Taylor, the 13-year-old girl . . . ?
>
> . . . .
>
> [State:] And what did he—what did Taylor, the 13-year-old girl, respond to that?

VRP at 182 (emphasis added). Through this use of language, the State was frequently reminding the jury that it was Det. Kartes, not an actual girl, who was responding. We see nothing improper with the language used by the State.

Next, we address Head's related argument that the State committed misconduct during closing when it suggested that "the *only* reason" a child did not get raped was because law enforcement arrested him (even though "Taylor," the "child" never existed). We agree with Head that this comment during closing was likely improper, but we hold that it does not rise to the level of incurable prejudice.

Had Head objected during the State's rebuttal, the trial court could have issued an instruction for the jury to disregard the State's comment. *See Emery*, 174 Wn.2d at 766 ("[J]urors are presumed to follow the court's instructions."). Moreover, the likelihood that such curative

23

instruction would have alleviated any prejudice is supported by the overwhelming evidence of Head's guilt. Head engaged in a lengthy incriminating text discussion with the detective and, consistent with the instructions from the detective, appeared at the specific store in possession of a Red Bull energy drink and other items consistent with his intent to commit the crime. Thus, the prosecutor's comments did not constitute incurable misconduct that would warrant reversal or a new trial.

B.  FRAMING OF HEAD'S PROSECUTION AS REPRESENTATIVE OF "WAR" ON CHILD EXPLOITATION

Continuing his focus on the State's closing arguments, Head also argues that the State committed misconduct when it "improperly preyed on social fears about child exploitation" and made his case a "symbol" of this greater social cause. Opening Br. at 13, 23 (boldface and italics omitted).

For this argument, Head isolates two specific remarks that the State made during closing arguments:

> [Head] could not have had sex with that particular 13-year-old Taylor that night because that particular 13-year-old Taylor was Det. Kartes. He didn't know that. "*What we're trying to do is criminalize 26-year-old men having sex with a 13-year-old girl and hold people accountable for that. We're trying to ferret that out before it happens.*"

Opening Br. at 21 (emphasis added) (boldface omitted) (quoting VRP at 260-61).

> "The Defendant planned to have sex with a 13-year-old girl. We have that Child Exploitation and Human Trafficking Taskforce to stop that the best we can. That's why that operation . . . joined with the FBI taskforce to stop people who are out there trying to have sex with 13-year-olds."

Opening Br. at 21 (boldface omitted) (quoting VRP at 266-67).

Relying on our Supreme Court's decision in *State v. Loughbom*,[9] Head argues that these remarks "generated a theme that law enforcement is fighting a war on child predators, that [he] was a child predator, and that the jury should convict [Head] to keep future children safe." Opening Br. at 14. According to Head, these statements "had nothing to do with the State's evidence" and led to him being convicted based on "the jury's fears" and "societal passions." Opening Br. at 13-14.

In *Loughbom*, our Supreme Court held that the prosecutor's repeated references to the "war on drugs" constituted reversible error. 196 Wn.2d at 77. The court explained that "a prosecutor may not urge a jury to 'convict in order to protect the community, deter future law-breaking, or other reasons unrelated to the charged crime.' " *Id.* at 72 (quoting *State v. Ramos*, 164 Wn. App. 327, 338, 263 P.3d 1268 (2011)). By framing the defendant's prosecution as representative of the war on drugs multiple times during opening statement, closing argument, and rebuttal, the State in that case had exceeded its "wide latitude" to make reasonable inferences. *Id.* at 77. And the cumulative effect of these references had caused incurable prejudice because it "primed" the jury to view the prosecution through the prism of the "battle in the ongoing war on drugs." *Id.*

Head also relies on two previous Court of Appeals decisions, *State v. Smiley* and *State v. Thierry*, that involved improper arguments by the State in the context of prosecutions involving child exploitation. In those two cases, we held that it was improper for the State to suggest that if the jury did not believe the victim's testimony, then it would be more challenging (or impossible) to prosecute future cases of child sexual abuse. 195 Wn. App. 185, 194, 379 P.3d 149, *review*

---

[9] 196 Wn.2d 64, 470 P.3d 499 (2020).

*denied*, 186 Wn.2d 1031 (2016); 190 Wn. App. 680, 691, 360 P.3d 940 (2015), *review denied*, 185 Wn.2d 1015 (2016). For example, in *Thierry*, the State essentially argued to the jury that if the jury did not believe the victim's testimony, "then the State may as well just give up prosecuting these cases, and the law might as well say that [t]he word of a child is not enough." 190 Wn. App. at 691 (alteration in original) (internal quotation marks omitted). We held that this "hyperbole" posed a risk of jurors deciding to believe the child victims' testimony for improper reasons—such as the prevention of the larger issue of future children being in danger.[10] *Id.*

According to Head, the State committed the same type of misconduct that occurred in *Loughbom*, *Thierry*, and *Smiley*. When the State claimed that it was attempting to "ferret" out people seeking to sexually assault minors and that law enforcement was attempting to "stop people who are out there trying to have sex with 13-year-olds," the State was making arguments that had nothing to do with the evidence against Head. According to Head, the comments further suggested that convicting Head was really about the State's larger goal of preventing the exploitation of children, not whether the evidence supported Head's actual guilt.

We disagree. The State's comments fell short of the sensationalized statements made in these three cases. In *Loughbom*, the State's references to "the war on drugs" served no purpose other than to sensationalize the defendant's alleged crimes. In contrast, here, the State had to

---

[10] In *Smiley*, the State argued that if the jury did not believe the victim, "kids would have to be told, we're sorry, we can't prosecute your case, we can't hold your abuser responsible . . . ." 195 Wn. App. at 194 (internal quotation marks omitted). Like *Thierry*, the *Smiley* court held that these comments were improper because a defendant's conviction should not be based on jurors being made to feel responsible "for ensuring that the criminal justice system is effective in protecting children." *Id.* at 195.

explain the concept of a "net nanny" undercover operation and how a defendant could still potentially be found guilty of attempted rape of a child, even though there was never a real victim or the possibility that the defendant could actually complete their attempted crime. With this context, the State's comments read less like an emotional appeal to the jury's fears of child exploitation and more like an explanation of how the evidence proved Head's guilt. Thus, Head's reliance on *Loughbom* is misplaced.

*Smiley* and *Thierry* are similarly inapplicable. In those cases, the State conflated its future ability to prosecute perpetrators with whether the jurors believed the victim in those particular cases. There, the focus was on the jurors' potential fears about future child exploitation cases, not on the evidence against the specific defendants.

No similar shift of focus occurred here. The two statements isolated by Head can be characterized as accurate summaries of the background of the net nanny operation from Det. Kartes' testimony. Although the State made these comments while also arguing for Head's guilt, we view that connection as falling short of the improper conflations made in *Smiley* and *Thierry*. While it is a matter of degree, the State here did not focus the jury on serving a greater societal purpose at the expense of viewing the evidence specifically against Head.

This is especially true when the State's comments are viewed, not in isolation, but in the context of the entire closing argument. *See McKenzie*, 157 Wn.2d at 52. Viewed this way, the State predominately focused on guiding the jurors through each of the elements of the charged crimes and outlining the evidence supporting each element. And, at the end of both the State's closing and its rebuttal, the State underscored that it was the jury's "job" to weigh the credibility

of the witnesses and to base their decision on an application of the law to the facts.  The State's

comments were not improper.

C.  PERSONAL OPINIONS ON GUILT

Finally, Head identifies the following two passages from the State's closing and rebuttal

arguments that he contends constitute improper opinions on guilt:

> When he says by way of text or e-mail, "Show me a picture of your pussy with four fingers," and I apologize for that language—those aren't my words; those are the Defendant's words—I think we could all agree that not only is that immoral purposes, but it's also a sexual nature.  I think when the Defendant sends texts and e-mails that says, "I'm going to give you a good pounding" multiple times when he knows she's 13, *I think that's immoral purposes of a sexual nature, and I hope you agree with me, because that's exactly what that is.*

Opening Br. at 36 (quoting VRP at 262) (emphasis added).

> The Defendant is afforded many constitutional rights throughout the course of this case. . . . Number one is the Defendant's right to a fair trial.  *The State also has a right to a fair trial.  But I want to commend you and everybody involved in this process because both sides, in my opinion, did get a fair trial, and we're thankful for that.*  And we talked about how the system would shut down if people didn't show up.  You heard some of the things that people said in jury duty.  You people are willing to do—do your civic duty, and I appreciate that.  And that affords the State and the Defendant a fair trial.

Opening Br. at 36 (quoting VRP at 267-68) (emphasis added).

Head claims that by first expressing a personal opinion that Head was guilty of Count II

and then later in rebuttal opining that Head received a fair trial, the prosecutor "suggested to the

jury that the State believed he was guilty, the court had done its part trying [him] fairly, and the

only thing left for the jury to do was convict."  Opening Br. at 37.

The State concedes that the prosecutor's statements raised by Head were improper,

however it argues that Head cannot prove that they were so flagrant that they could not be cured

by an instruction. The State contends that given the overwhelming evidence it presented to support Head's conviction, "there is no reason to believe the prosecutor's improper comment[s] affected the outcome of the trial. Resp't's Br. a 26.

We agree with the State. Because these two expressions were relatively clear, a curative instruction from the trial court could have been surgically applied so that the jury understood precisely what statements should be disregarded. And, as discussed above, the State presented overwhelming evidence that Head took a substantial step towards the commission of first degree rape of a child when he knowingly communicated with whom he thought was a 13-year-old girl and made plans to meet up with her to engage in sexual acts. Thus, Head cannot demonstrate that he was prejudiced by the State's improper statements, so his claim for prosecutorial misconduct is waived.[11] *See Azevedo*, 31 Wn. App. 2d at 78-79.

III. APPEARANCE AT SENTENCING FROM A HOLDING CELL

Head next argues that his due process rights were violated when he appeared in an in-court cell for his sentencing hearing. Citing to our Supreme Court's decision in *State v. Luthi*, Head argues that the trial court failed to engage in the necessary inquiry "to determine if 'extraordinary circumstances' require[d] that restraint for security reasons." Opening Br. at 61 (quoting *State v. Luthi*, 3 Wn.3d 249, 257, 549 P.3d 712 (2024)). The State responds that this claim cannot be raised

---

[11] To the extent Head also argues that incurable prejudice resulted from the cumulative effect of multiple instances of improper conduct, we disagree. Even combining the two instances of likely misconduct (the State's comment regarding "the *only* reason" a child did not get raped, and the State's improper expression of opinion), the resulting prejudice was not incurable, especially given the overwhelming evidence of Head's guilt.

for the first time on appeal because Head has failed to show that it constituted a manifest constitutional error. We agree, on these facts, with the State.

We may refuse to review claims of error which were not first raised before the trial court. RAP 2.5(a). However, a party may raise a "manifest error affecting a constitutional right" for the first time on appeal. RAP 2.5(a)(3). An error is manifest if the appellant shows actual prejudice. *State v. J.W.M.*, 1 Wn.3d 58, 91, 524 P.3d 596 (2023). The appellant must make a plausible showing that the claimed error had practical and identifiable consequences. *Id.* "[T]o determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the [trial] court could have corrected the error." *State v. O'Hara*, 167 Wn.2d 91, 100, 217 P.3d 756 (2009).

Under this standard, the trial court's error was not manifest on these facts. As pointed out by Head, *Luthi* was not decided until two days *after* Head's sentencing.[12] At the time of Head's sentencing, no Washington court had held that a defendant's appearance at nonjury proceedings in an in-court holding cell constituted a restraint subject to due process protections. *See Luthi*, 3 Wn.3d at 258-61. Thus, the trial court's failure to conduct an individualized determination of whether Head's restraint was necessary was not an obvious error on the record. Given what the trial court knew "at the time" of Head's sentencing hearing, it could not have corrected its error. *See O'Hara*, 167 Wn.2d at 100.

---

[12] Head was sentenced on June 11, 2024, and *Luthi* was decided on June 13, 2024. 3 Wn.3d at 249.

IV. COMMUNITY CUSTODY CONDITIONS

Head challenges community custody conditions (a)(8), (b)(9), and (b)(16). He argues that community custody condition (a)(8) is unconstitutionally vague and argues that conditions (b)(9) and (b)(16) "impose unlawful fines and fees despite [his] indigence." Opening Br. at 70-71.

A. COMMUNITY CUSTODY CONDITION (a)(8)—VAGUENESS

Head argues that condition (a)(8) is unconstitutionally vague and overbroad. Condition (a)(8) requires Head to "[r]emain within [the] geographic boundary," that is determined by his Community Corrections Officer (CCO). CP at 48.

Community custody conditions that are vague are unconstitutional under the Fourteenth Amendment of the United States Constitution and article I, section 3 of the Washington Constitution. *State v. Hai Minh Nguyen*, 191 Wn.2d 671, 678-79, 425 P.3d 847 (2018). Community custody conditions are unconstitutionally vague if they do not (1) define the condition " 'with sufficient definiteness that ordinary people can understand what conduct is proscribed' " or (2) "provide ascertainable standards to protect against arbitrary enforcement." *Id.* at 678 (quoting *State v. Bahl*, 164 Wn.2d 739, 752-53, 193 P.3d 678 (2008)). Community custody conditions are " 'not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct.' " *State v. Padilla*, 190 Wn.2d 672, 677, 416 P.3d 712 (2018) (internal quotation marks omitted) (quoting *State v. Sanchez Valencia*, 169 Wn.2d 782, 793, 239 P.3d 1059 (2010)).

It is within the trial court and Department of Corrections' (DOC) statutory authority to impose community custody conditions. *State v. Lundstrom*, 34 Wn. App. 2d 977, 980, 572 P.3d 1243 (2025). Within those statutes, the legislature has mandated the trial court to order defendants

to comply with the conditions imposed by DOC and has mandated DOC to "instruct an offender to '[r]emain within prescribed geographical boundaries.' " *Id.* (alteration in original) (quoting RCW 9.94A.704(3)(b)).

Recently, in *State v. Lundstrom*, Division I held that a similar community custody condition was not unconstitutionally vague.[13]  34 Wn. App. 2d at 983.  There, the court explained that by imposing the challenged condition, the trial court "complied with [its] statutory mandate" and that "a person of ordinary intelligence can understand what the condition proscribes." *Id.* at 980.  The court also reasoned that DOC's authority to impose geographic boundaries was not unlimited. *Id.* at 981.  DOC's statutory authority is curbed to only allow community custody conditions that are reasonably related to the crime of conviction, the offender's risk of reoffending, or the safety of the community.  RCW 9.94A.704(7)(b).  Additionally, "if an offender disagrees with the validity of a CCO-imposed geographical condition, they may, within a specified time, 'request an administrative review' of the condition." *Lundstrom*, 34 Wn. App. 2d at 981 (quoting RCW 9.94A.704(7)(b)).

Head argues we should reject *Lundstrom* as wrongly decided.  He argues that such conditions grant his CCO "unfettered discretion" to determine where he must reside without providing "any standards or guidance on how this officer should set these exclusion zones." Opening Br. at 71; Reply Br. at 40.  According to Head, *Lundstrom* relied too heavily on DOC's

---

[13] The community custody condition in *Lundstrom* required the defendant to " '[r]emain within geographic boundaries, as set forth in writing by the [CCO] or as set forth with [stay out of drug area (SODA)] order.' "  34 Wn. App. 2d at 979 (alterations in original) (footnote omitted).

statutory authority to impose geographic boundaries and that the *Lundstrom* court abandoned its "independent obligation not to impose vague conditions of community custody." Reply Br. at 41.

We are not persuaded to reject *Lundstrom*. We agree with its reasoning and similarly hold that the trial court here followed the legislature's statutory mandate, and that community custody condition (a)(8) is not unconstitutionally vague. Further, we note that Head does not appear to be challenging the constitutionality of RCW 9.94A.703 (requiring the trial court to comply with conditions imposed by DOC) or RCW 9.94A.704(3)(b) (requiring DOC to instruct defendants to remain within certain geographic boundaries), and unlike community custody conditions, statutes are presumed constitutional and must be proven to be unconstitutional beyond a reasonable doubt. *Bahl*, 164 Wn.2d at 753. We affirm Head's community custody condition (a)(8).

B. COMMUNITY CUSTODY CONDITIONS (b)(9) AND (b)(16) — INDIGENCY

Head argues that community custody conditions (b)(9) and (b)(16) should be struck because they require him to pay for fees related to his supervision, specifically for mandatory polygraph tests and internet monitoring, even though the trial court later found him to be indigent.

The State concedes that Head's requirement to pay for these expenses of his supervision should be struck but that the conditions should otherwise remain in place.

We accept the State's concession and remand to the trial court to amend Head's community custody condition, eliminating his financial responsibility for these aspects of his supervision.

CONCLUSION

We affirm Head's convictions. But we remand his judgment and sentence to the trial court to amend his community custody conditions requiring him to pay for fees related to his supervision.

No. 59709-8-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

VELJACIC, A.C.J.

CHE, J.